## McKinney v. Barker.

(Decided May 14, 1918.)

## Appeal from Fayette Circuit Court.

1. Elections—Contest.—One who is defeated in an election may nevertheless contest, in a suit brought for that purpose, the right of his opponent to take and hold the office.

2. Elections—Corrupt Practices Act—Time of Filing Statement Directory.—Under the provisions of chapter 13, Acts 1916, page 53, known as the Corrupt Practices Act, candidates must file both a pre-election and post-election statement of expenses therein required, as such provisions are mandatory, but the time for the filing of them, as specified in the act, is directory.

3. Elections—Constitutional Law—By the use of the word "election" in our constitution as applied to the selection of candidates or the choice of measures to be adopted or rejected is meant that for the accomplishment of the selection or choice the candidate in order to be elected must receive a majority of the votes cast if only two candidates are voted for, or a plurality if more than two are voted for, and the General Assembly has no authority to provide otherwise or to provide that the person receiving less than such majority or plurality shall be declared elected. The proviso in section 11 of the Corrupt Practices Act, supra, in so far as it provides for the election of a candidate receiving less than a majority or plurality of the votes is unconstitutional and void, but it is competent for the act to penalize its violations by the candidate as it does, even to the extent of depriving him of the right to take and hold the office.

4. Elections—Corrupt Practices Act—Constitutional Law.—To uphold the proviso in the section of the act just referred to would violate section 6 of the constitution requiring that "all elections shall be free and equal," in that an election to be "free and equal" each legal vote shall have the same decisive effect upon the result of the election, which would be denied if a minority vote can be declared to elect.

5. Elections—Corrupt Practices Act—Vacancy.—If by reasons of violations of the act the candidate receiving the majority or plurality of the votes becomes incapacitated to assume the office, it should be declared vacant, and to be filled in the manner provided by law.

J. KEENE DAINGERFIELD for appellant.

S. S. GANTIS for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

At the regular November election, 1917, the appellant (plaintiff) and appellee (defendant) were rival candidates for the office of justice of the peace in the seventh magisterial district in Fayette county, Kentucky, the former being the regular Democratic nominee, and the latter being the Republican nominee, each of their names being legally on the ballot to be voted at the regular election and printed in the proper columns under their respective party devices. The plaintiff received at the election 290 votes, while the defendant received 308 votes.

After the canvassing board had tabulated the returns and ascertained the result, and within the time provided by law, plaintiff filed this suit against the defendant, his opponent, alleging that he had filed on the fifteenth day before the election the pre-election statement of expenses required of candidates by section 4 of chapter 13, Acts of 1916, commonly known as the Corrupt Practice Act, and he averred facts showing that the statement fully measured up to the requirements of that section and that the defendant, his opponent, although receiving a majority of the votes was not entitled to the certificate of election or to the emoluments of the office because he had wholly failed to file any pre-election statement, either on the fifteenth day preceding the election, or any other day prior thereto. He therefore asked the court to adjudge the election of the defendant void and that he be declared elected, and that the canvassing board be directed to issue to him the certificate of election. He also averred that he had fully complied with the provisions of that Act with reference to the filing of a post election certificate or statement, and in all other respects. He based his right to the relief which he sought in the suit upon the provisions of section 11 of the Act referred to, which is in these words:

"In any contest over the nomination or electon of any officer mentioned in this act it may be alleged in the pleadings that the provisions of this act have been violated by the candidate or by others in his behalf with his knowledge, and if it so appears upon the trial of said contest, then said nomination or election shall be declared void, and it is hereby provided that the candidate who has received the next highest number of votes and who has not violated the provisions of this act shall be declared nominated or elected unless it also appears that one of the parties to the contest received a plurality of the votes cast and did not violate the provisions of this act."

A demurrer filed to the petition was overruled, and in the answer filed thereto the defendant admitted the truth of the statement that he had failed to file any pre-election statement, but attempted to excuse his default because he said that up to the day of the election neither he nor anyone else in his behalf had spent any sum whatever in his campaign, and that it was therefore unnecessary to file a statement.

A demurrer filed to the answer was overruled, and plaintiff declining to plead further, his petition was dismissed, followed by a judgment that defendant was duly elected and entitled to the office, and the canvassing board was directed to issue to him a certificate of election. Complaining of that judgment, plaintiff prosecutes this appeal.

In the recent case of Sparkman v. Sayler, 180 Ky. 263, we held that the requirement of the act referred to that both pre-election and post election statements be filed was mandatory, but that the requirement as to the specific time when they should be filed was directory, and that if the pre-election statement was filed a sufficient time before the election to serve the purpose of the act it would be sufficient. Under the interpretation thus given, it is clearly manifest that the answer failed to allege a defense, since it is admitted therein that no pre-election statement whatever was filed, and it is not a sufficient excuse for a failure to file it that the candidate had spent no money in his campaign, because it is as necessary that such fact be divulged before the election as it is to make known sums that had been spent, if any, for legitimate purposes. The same reasoning would justify a failure to file the certificate when the candidate,

although he had used campaign funds, had done so within the limitations and for the purposes prescribed by the statute; i. e., that he had not violated the statute, and the necessity for the statement was removed. The court therefore committed error in overruling the demurrer to the answer and in adjudging the defendant elected and entitled to the office.

A more serious question is presented upon the contention of plaintiff that under the proviso in the latter part of section 11, *supra,* of the Act he should be declared elected and entitled to the office. It will be noticed that in the section referred to it is first provided that if any candidate violates any of the provisions of the Act (one of which is the filing of the pre-election statement) in a contest over the election "said nomination or election shall be declared void," and this is followed by a proviso that the candidate who receives the next highest number of votes, and who has complied with the provisions of the act, shall be declared elected to the office if it is the general election, or nominated if it is a primary election. In this case we are not concerned about the effect of such a provision in a contest over a nomination at a primary election, for the one here involved is a general election to fill the office. So the question is—did the legislature exceed its power in providing that the one who received neither a majority nor a plurality of the votes should be declared elected and entitled to the office?

At the threshold it may be admitted that it was competent for the legislature to enact the proviso, unless inhibited from doing so by some provision of the Constitution properly construed manifesting an intention on the part of the people in adopting that instrument to withhold such power. Our Constitution creates a number of offices, from Governor down, and in the sections creating them it is provided that they shall be chosen at an *election* by the people in which all qualified voters may participate. It is so provided with reference to the office of justice of the peace by section 99 of that instrument, wherein it is said: "There shall be elected in 1894 . . . . in each justice's district one justice of the peace," &c., and throughout that instrument it is everywhere manifest that the qualified voters of the territory to be affected shall elect the officers charged with the administration of public affairs, and by the same process

of election such voters shall have the right to determine whether certain questions, measures or policies shall or not be adopted within the territory to be affected. Other parts of it contain provisions, or empower the legislature to enact provisions, for the purpose of safeguarding the ballot and to insure the purity of elections and the elimination of fraud, so that the sovereign voice of the voter as expressed in the election shall be free, full and fair, and that the result shall represent the combined will of those participating in the election in the manner provided by a government instituted for and by the people.

In section 6, being a part of the Bill of Rights, it is said: "All elections shall be free and equal." It then becomes necessary to inquire what the makers of the Constitution, as well as the people in adopting it, meant by the use of the word "election" as used therein, and what was meant by the adoption of section 6, *supra*. All the authorities agree that the legal definition of an election, as well as that which is usually and ordinarily understood by the term, is a *choosing* or a *selection* by those having a right to participate of those who shall fill the offices, or of the adoption or rejection of any public measure affecting the territory involved. 15 Cyc. 279; Lewis v. Boynton, 25 Colo. 486; Saunders v. Haynes, 13 Cal. 145-491; Seaman v. Baughman, 82 Iowa 216; 11 L. R. A. 364; State v. Hirsh, 125 Ind. 207, 9 L. R. A. 170, and Bouvier's Law Dictionary. The definition given by Mr. Webster is, "The act of choosing a person (or measure ) to fill an office or employment, by any manifestation of preference." In fact this definition of the term was thoroughly engrafted into the law without dissent from any source at the time of the adoption of our Constitution, but we need go no further than that instrument itself for a definition of the word, for in section 147 therein it is said: "The word 'elections' in this section includes the decision of questions submitted to the voters, as well as the *choice* of officers by them."

It is true that by the language quoted the term was made to include the decision of questions by the voters, as well as the selection of officers, but it is therein said that when applied to the selection of officers it is a choosing by the people of the persons who shall fill the office. This same definition of the word "election" is approved in the cases of Speed & Worthington v. Crawford, 3 Met. 207, and Police Commissioners v. City of Louisville, 3

Bush 597, wherein it is said that "The term 'election' in its constitutional sense and meaning is used to designate a selection by the popular voice." It is therefore necessary to determine what was regarded as essential to express the choice of the people as understood and intended by the use of the word "election" in the Constitution. In the volume of Cyc., *supra,* 308, it is said:

"In the absence of any statute expressly requiring *more,* a plurality of votes is sufficient to elect. And *a fortiori,* in the absence of any provision in the Constitution requiring a civil officer to be elected by a majority of votes a state legislature may lawfully provide that a *plurality* of votes shall be sufficient to elect any officer."

In the seventh edition of Cooley's Constitutional Limitations, 931, it is said:

"Unless the law under which the election held expressly requires *more,* a *plurality* of the votes cast will be sufficient to elect. . . . If several persons are to be chosen to the same office, the requisite number who shall stand highest on the list will be elected, but without such a plurality no one can be chosen to a public office."

McCreary on Elections, sec. 206, thus states the rule: "In the absence of any statutory provisions expressly requiring *more,* a *plurality* of the votes cast will elect"; and in section 330, the author says with reference to the election of the minority candidate when his opponent is for any reason ineligible to hold the office: "Thus it will be seen that the weight of authority in this country is decidedly against the adoption here of the English doctrine. And we think that sound policy, as well as reason and authority, forbids the adoption of that doctrine in this country. It is a fundamental idea with us that the majority *shall rule,* and that a majority *or at least a plurality,* shall be required to elect a person to office by popular vote. An election with us is the deliberate choice of a majority or plurality of the electors. Any doctrine which opens the way *for minority* rule in any case is anti-Republican and anti-American."

In 9 R. C. L., page 1115, the text says: "The plan almost universally adopted in reference to the election of officers . . . . provides for the recognition of the choice of the majority of those voting where there are but two candidates for election, and of a *plurality* where there are more than two candidates. This is the general rule where the number of electors is indefinite. So the

only way to defeat the election of a candidate at an election is by voting for another candidate."

To the same effect are the cases of Commonwealth v. Cluley, 58 Pa. State 270, 94 Amer. Dec. 75; Barnum v. Gilpin, 27 Minn. 466, 38 Amer. Rep. 304; Sublette v. Bedwell, 47 Miss. 266, 12 Amer. Rep. 338; People v. Clute, 50 N. Y. 451, 10 Amer. Rep. 508; State v. Giles, 2nd Pinn. 166, 52 Amer. Dec. 149; People v. Peace, 84 Amer. Dec. 268; Howes v. Perry, 92 Ky. 260, 36 Amer. St. Rep. 591; State v. Bateman, 162 N. C. 588, Ann. Cas. 1915B, 515; State v. Bell, 124 Amer. St. Rep. 203, and a great number of·cases found in the annotated notes to many of the cases and authorities cited. A few excerpts from some of the cases referred to illustrative of the reasons prompting the courts in accepting and applying the rule as *essential* to the American idea of an election will be sufficient.

In the case of Sublette v. Bedwell, *supra,* the court in treating of the question said:

"The foundation of our system of government reposes upon the ultimate sovereignty of the people. Those who exert authority and discharge the functions of government in any of the departments among which its powers are distributed, come into existence and perform the functions respectively assigned them, according to the modes prescribed by the people *in the organic law,* framed by their representatives and adopted by themselves. When they reserve to themselves the selection of a class of officers by popular election, a fundamental principle (unless otherwise expressly provided) is, that the person receiving a majority of legal votes over his competitor is entitled to the office. It *cannot* be said that the candidate has been *elected* unless he has received a majority of the legal votes cast; he is not the choice of the people. If the majority make choice of a candidate under some personal disability, disqualifying him from taking and enjoying the office, the utmost that can be said of it is that there has been no election."

Further along in the opinion, in denying the right of a minority candidate to the office because of the ineligibility of the one receiving a majority or a plurality of the votes, it is said:

"Without going into the general reasoning, the great weight of American authority, and, as we think, upon the soundest consideration, is that although the majority vote for a disqualified person, the votes so cast are not il-

legal, and therefore to be treated as naught; but the result is, if the ineligible candidate cannot take the office, the electors have failed to make a choice. In truth, there has been no election at all, and the minority candidate has no right to the office. State of Georgia v. Swearingen, 12 Ga. 24; State, ex rel. of Off v. Smith, 14 Wis. 497; States v. Giles, 1 Chand. 112; Saunders v. Haynes, 13 Cal. 152; The Answer of the Supreme Court of Maine, 38 Me. 597. The case of Vance and Abbott in United States Senate, recently, was considered upon its legal merits and decided in accordance with the great weight and merit of American judicial adjudication.''

Our own court, where the same question was involved concerning the right of a minority candidate to be declared elected because the one receiving the majority or plurality of the votes died before the polls closed, in the case of Howes v. Perry, *supra,* said:

''It is a principle of *free elections* by the people, *firmly fixed* and understood, that no person is or can be regarded duly elected to an office unless, when only two persons are voted for, he receives a majority of the votes cast for them, or receives a plurality in case there are more than two voted for. *Any other rule would be subversive of the fundamental idea of elections by the people under our form of government,* which is, that only that person shall be entitled to hold an elective office who appears, from the record of votes cast, to have been the choice of a *majority or plurality* of those voting in such elections.''

This rule constituting a necessary element in the constitutionally provided machinery called an election, whereby the people choose their officers and adopt or reject public measures, is so fundamental and so much cherished by the courts that all of them everywhere deny the right of election to any candidate receiving a less number of votes than a majority cr a plurality when his opponent receiving such majority or plurality was ineligible for the office or who died before the election was over. 15 Cyc. 391, 9 R. C. L. 1125; Howes v. Perry, *supra;* Sublette v. Bedwell, *supra;* Grinstead v. Scott, 82 Ky. 88; Stevens v. Wyatt, 16 B. Mon. 542; Dobbs v. Buford, 128 Ga. 483; 11 Ann. Cases 117; State v. Bell, 169 Ind. 61; Taylor v. Sullivan, 45 Minn. 309, 22 Amer. St. Rep. 729, 11 L. R. A. 272; Sheridan v. St. Louis, 183 Mo. 25, 2 Ann. Cases 480; State v. Bateman, 162 N. C. 588,

Ann. Cases 1915B 515; State v. McGeary, 69 Vermont 461, 44 L. R. A. 446. Throop on Public Officers, sec. 163; Mechem on Public Officers, sec. 206, and authorities *supra*. Indeed there is no dissent from the proposition by any of the courts, including those of England, except that in that country the rule is modified to the extent of allowing the minority candidate to be declared elected when and only when the voters had knowledge at the time of casting their ballots of the ineligibility of the candidate receiving a majority or a plurality of the votes. This exception was injected by the courts of England upon the idea that the voter with such knowledge was willing "to throw his vote away," so to speak, and for his participation in the election to have no greater effect than if he had remained away from the polls and declined to vote. Only one state in the Union has adopted the English rule, which is the state of Indiana, all the other courts holding that although the candidate receiving a majority or a plurality of the legal votes *legally cast* was ineligible and the voters knew that fact, yet they must be counted and they constitute a part of the total votes cast in the election, and that no one can be elected unless he received a *majority* or a *plurality* of all such legal votes so cast. From this unanimous and unbroken line of judicial definitions of what is included in the term, it can not be gainsaid that the idea of an election in all Republican forms of government is that no one can be declared elected and no measure can be declared carried, unless he or it receives a majority or a plurality of the legal votes cast in the election, and this was the understood meaning, definition and scope of the term "election" at the time of the adoption of the Constitution, for it must be remembered that those constituting the majority or plurality not only vote for the candidate or measure of their choice, but they also vote against the other candidate or candidates and against the opposing side of the submitted measure.

It is a fundamental rule that in construing constitutions, terms employed therein shall be given the meaning which had been put upon them and which they possessed at the time of the framing and adoption of the instrument. Thus it is said in 6 A. & E. Ency. of Law, second edition, page 925:

"But where a word has acquired a fixed technical meaning in legal and constitutional history, it will be

presumed to have been employed in that sense in a written constitution," and that "terms are to be construed according to their meaning *at the time* of the adoption of the Constitution, rather than at any other date. And constitutional powers cannot be enlarged by giving the terms employed a meaning which they may have had long previously but not when used by the framers of the instrument."

To the same effect are Cooley's Constitutional Limitations, second edition, pages 94, 95 and 96; 1 Story's Constitution, section 453; 12 Corpus Juris 706; Jenkins v. Ewin, 8 Heiskell (Tenn.) 456; Jefferson County Board of Revenue v. State, 172 Ala. 138; Daily v. Swope, 47 Miss. 367; Cruger v. Hudson Railroad Co., 12 New York, page 190; 6 R. C. L., pages 51 and 52.

Applying then the rule just stated to the case in hand, what, may we inquire, did the framers of the Constitution mean by the use of the word "election" as employed in that instrument when applied to the selection of officers by the people? We have seen that the meaning universally given to that term by the courts, at least throughout the United States, was a selection or choice by the legally qualified voters participating therein casting for the successful candidate a *majority* or a *plurality* of the votes, and that no one could be declared elected at such an election who did not receive votes sufficient to give him either a majority or a plurality. This being true, it necessarily follows that the constitution used the word in that sense as completely as if the definition had been so written therein, and that any act of the legislature restricting that meaning so as to make a less number of votes sufficient to elect contravenes the Constitution and is necessarily null and void. To hold otherwise would not only be to sanction a perversion of the plain intent and meaning of the Constitution, but it would enable the legislature to strike a blow at the very foundation stone of our boasted republican form of government, for when we cease to be governed and have public affairs administered by officers elected by a majority or a plurality of the legal votes of those entitled to exercise the right of suffrage, we turn aside from the idea of such form of government and put its administration into the hands of the minority, even the smallest. It was to prevent this, as we believe, that the Constitution declared that, "all

elections should be free and equal''; free in that every one entitled to vote should have a reasonable opportunity to do so, a reasonable manner of doing so, &c., and equal in that every vote cast should have its decisive effect in the selection or choice to be made at the election. 9 R. C. L. 984-5; Board of Trustees, &c., v. Scott, 125 Ky. 545 (page 569), and Wallbrecht v. Ingram, 164 Ky. 463.

In R. C. L. referred to page 985, upon this point it is said: ''The word 'equal' as used in the guaranty has a somewhat different significance from that of 'free.' It comprehends the principle that every elector has the right to have his vote count for all it is worth in proportion to the whole number of qualified electors desiring to exercise their privilege.''

In discussing the constitutionality of the statute commonly known as the County Unit Law, passed by the legislature of this state, in the case of Board of Trustees, &c., v. Scott, *supra,* this court held that although the result of the election gave more force to a vote in favor of prohibition than it did to a vote against it, the statute was nevertheless constitutional because ''All votes have precisely the same weight in the election. No one's vote counts for more than another's on that question.''

Under the guise of regulation which the legislature no doubt possesses with reference to elections, that body may enact laws looking to the protection of the voter, the fairness of the count, the prevention of fraud and corruption, and such others within reasonable limitations as it may deem necessary to insure a fair election and a free expression of the choice of the voter. But it may not, under such guise, invade the constitutional guaranty that all elections shall be equal, nor can it declare anything to be an election contrary to the meaning of that term as used in the Constitution. Indeed section 151 of that instrument would seem to confine the powers of the legislature within the limitations above expressed. It reads:

''The General Assembly shall provide suitable means for depriving of office any person who, to procure his nomination or election, has, in his canvass or election, been guilty of any unlawful use of money, or other thing of value, or has been guilty of fraud, intimidation, bribery, or any other *corrupt practice,* and he shall be held responsible for acts done by others with his authority, or ratified by him.''

Authority is there given for legislation against "fraud, intimidation, bribery or other *corrupt practice*" affecting the result of an election, but the only penalty which the legislature is authorized to affix for the violation of any statute which it may enact thereunder is to punish the offender and to deprive the guilty party of his nomination, or of his office if the election was one to fill it. No right is therein conferred to elevate to the office a candidate receiving a minority of the votes, and who was voted against and defeated by the majority or plurality, but the only authority given is to penalize the guilty candidate by punishing him and by withholding from him the right to the office.

In the case of Perkins v. Auditor, 79 Ky. 306, the question was presented whether the provision in the Constitution then in force, to the effect that salaries of officers might be diminished for neglect of duty, by implication withheld the power to reduce such salaries for any other reason, and the court held that it did, quoting from and adopting Cooley on Constitutional Limitations, page 78, thus:

"When the Constitution defines the circumstances under which a right may be exercised or a penalty imposed, the specification is an implied prohibition against legislative interference, to add to the condition, or to extend the penalty to other cases," and the court then refers to the cases of Auditor v. Adams, 13 B. Mon. 150; Brown v. Grover, 6 Bush 1, and Robinson v. Swope, 12 Bush 21.

Applying this rule to the case here, when the Constitution authorized the legislature to enact statutes concerning the subjects mentioned in the section referred to (corrupt practices), it confined the penalty to punishing and depriving of office the guilty party only, and the legislature is without authority to add other consequences thereto as is attempted by the Corrupt Practice Act under consideration, especially when to do so would violate other provisions of the Constitution, as we have hereinbefore seen. To our minds it requires but slight consideration to demonstrate that if the act in question should be upheld as enacted it would afford greater opportunities for corrupt practices than to discard the proviso altogether. Under the act as passed the scheming and designing politician, or the corruptionist could persuade or induce, by deception, a popular candidate to neglect complying with the stat-

ute and procure a compliance therewith by a much less qualified, yet more pliant and perhaps corrupt candidate who might receive but few votes and yet be elevated to the office. Indeed it would be possible for an elector to elevate himself to the office by writing his own name upon the ballot and stamping opposite it, since the requirements of the Corrupt Practice Act would not apply to him. Such a result was never contemplated as being possible under the American idea of an election, and we are unwilling to uphold a statute which would permit it.

The conclusions which we have reached do not in the least conflict with the doctrine of the cases of King v. Mc-Mahan, 179 Ky. 536, and others referred to therein, since the name of the majority or plurality candidate in those cases was never legally voted for because his name was never legally put upon the ballot. Nor does this opinion conflict with that line of cases purging the election of fraudulent votes and awarding the election to the one receiving the highest number of legal votes.

Neither does this opinion impair the useful and wise purposes of the act, for they can be accomplished by enforcing its penalties against the guilty candidate, all of which are left intact, the opinion going only to the extent of denying the power of the legislature to visit upon the innocent voter the consequences of another's violations by stifling his voice and foisting upon him and others composing a majority or plurality of the voters in the election, an officer whom they had defeated for the office.

In this case it is admitted that all the votes cast at the election were legal, and each candidate voted for had his name legally printed on the ballot. When that is the case the election must be awarded to the one receiving the majority or at least a plurality of the votes, unless forsooth he be ineligible to hold the office, or render himself incapable of taking it because of the violation of some reasonable regulatory statute.

Under the rule laid down in the case of Grinstead v. Scott, *supra,* the plaintiff, although incapable of taking the office himself, may contest the election because of the ineligibility of his opponent, and the demurrer to the petition should have been sustained in so far as plaintiff sought to have the office adjudged to him, but overruled in so far as it sought to deprive the defendant from assuming the duties of the office. The election should have been declared null and void and that a vacancy existed.

No judgment should have been entered against the board of canvassers, since it was not a party to the suit.

Wherefore, the judgment is reversed, with directions to proceed in accordance with this opinion. The whole court sitting.