STATE EX REL. WOLFF, RELATOR, v. GEURKINK ET AL., RE-SPONDENTS.

(No. 8,175.)

(Submitted and Decided January 4, 1941. Opinion Filed February 6, 1941.)

[109 Pac. (2d) 1094.]

*Mr. F. F. Haynes,* for Relator, argued the cause orally.

*Mr. E. E. Fenton,* for Respondents, submitted a brief, and argued the cause orally.

MR. JUSTICE ANDERSON delivered the opinion of the court.

This suit was brought originally in this court by application for a writ of mandate to compel the board of county commissioners of Treasure county to reconvene as a board of canvassers of election returns and to issue a certificate of election to the relator, Harold S. Wolff, as elected to the office of clerk of the district court of said county at the general election held on November 5, 1940. An alternative writ was issued and the board of county commissioners filed their return and answer thereto, and the county clerk answered separately. By petition in intervention 166 electors of Treasure county appeared and joined as respondents in resisting the application for the writ. The cause was heard upon the pleadings and papers so filed, and,

with briefs of counsel and after oral argument, was so submitted. The exigencies of the case required prompt action, and to avoid delay the mandate of the court sustaining the relator's claim of election was issued and filed in advance of the written opinion.

After the issuance of the peremptory writ and before the completion and filing of the written opinion, the respondents filed a motion for leave to amend their answer and return to the alternative writ and asking the court to modify its order granting the writ. The amendments proposed were considered and found to contain nothing that would change the conclusion already reached by the court, and the motion to modify the order granting the writ is denied.

There is no dispute over the material facts. J. P. Gallagher was nominated as the Democratic candidate for the office of clerk of the district court of Treasure county at the primary election held on July 16, 1940. There was no other nomination made for the same office. On October 12 following, Gallagher died. The official ballots for the ensuing general election were printed on October 20, and Gallagher's name was printed on all such ballots as the Democratic candidate for clerk of court. J. P. Gallagher was the clerk of the court at the time of his death, and his widow, Marguerite Gallagher, was appointed by the county commissioners to fill the vacancy.

At the general election held on November 5, 400 votes were cast for J. P. Gallagher for the office of clerk of court. The relator, Harold S. Wolff, received 97 votes for the same office; Marguerite Gallagher received 26 votes, Clyde Miller received one vote, J. C. Shaeffer received one vote and J. O. Crandall received two votes—the names of all so voted for, other than the name of J. P. Gallagher, being written in on the ballots by the electors. The votes so cast were certified from the various voting precincts by the judges of election. The respondents, the county commissioners, acting as the county canvassing board, canvassed the election returns on November 8, 1940, and found and reported the votes cast for the office of clerk of court as stated. No certificate of election was issued, and the canvassing board, in

explanation thereof, adopted the following resolution, which was entered in the minutes of their proceedings:

"Whereas, J. P. Gallagher received the highest number of legal votes for the office of Clerk of the District Court of Treasure County, Montana, at the general election held in said County on November 5th, 1940, and

"Whereas, the said J. P. Gallagher died prior to the date of said election,

"Now, therefore, be it resolved, that the election of the said J. P. Gallagher as Clerk of the District Court, as aforesaid, be declared, and it is hereby declared, to be a nullity, and that the vacancy created by said void election shall be filled by an appointment to be made by this Board."

The relator claims his election to the office of clerk of court by reason of having received the highest number of votes cast for any living person for that office, and prays that a writ issue commanding the respondents, the county commissioners, to reconvene as a canvassing board and to recanvass the votes cast for the office of clerk of court, and that if they find that the relator, Harold S. Wolff, received the highest number of votes cast for a living person for that office at the said election, they then issue a certificate of election to him.

The relator in his affidavit in support of the application for the writ, in addition to the facts above as to the votes cast and what was done officially in the conduct of the election and the canvassing of the returns, sets out facts to show that there was a concerted effort on the part of the surviving widow of J. P. Gallagher and her friends and the officials having to do with the conduct of the election, to influence the voters and so conduct the election as to leave a vacancy in the office, with no one legally elected thereto, and which could then be filled by her appointment, and that the action of the canvassing board in declaring the result of the election as set forth in its resolution adopted and above referred to was part of such scheme and conspiracy.

As proof of the general dissemination of information of the death of J. P. Gallagher and knowledge thereof by the electors

of the county, and as evidence of the general scheme to make the surviving widow the clerk of court without an election, a printed page from an issue of the Midland Empire Farmer, a weekly newspaper published at the county seat and having a general circulation in the county, is attached to the application. On this page of the paper the death of J. P. Gallagher, the clerk of the court, is reported and an account of the funeral is given. In the biographical sketch in this report the following paragraph appears: ''He was elected as clerk of the district court for Treasure county in 1932 and took office the first of the year in 1933. He served in that capacity until his death Saturday morning. He would have been up for re-election in the November 5th general election. His name has been placed on the ballot.''

In another column of the same paper appears an article reporting the appointment of Mrs. Gallagher as clerk of court and calling attention further to the selection of a successor in the office. This article is as follows:

''At a special meeting of the board of county commissioners Wednesday morning, announcement was made that Mrs. Marguerite Gallagher was named to fill the unexpired term of clerk of the district court, following the death of her husband, J. P. Gallagher, early Saturday morning. Mr. Gallagher had served for eight years as clerk of the court.

''Board members in session Wednesday were Albert Geurkink, chairman, and M. I. Draper and George A. Feeley, members.

''Mr. Gallagher's name will appear on the general election ballots November 5th, and providing he receives the majority of votes for that office, the board of county commissioners will have the right to name a successor to fill that office for the next four years.''

On the same page of the newspaper is printed a complete copy of the official ballot to be used at the coming general election, with the name of J. P. Gallagher printed thereon as the Democratic candidate for clerk of court and the only candidate for

that office. The issue of the newspaper in which these matters appeared was printed on October 17.

The allegations of the relator as to knowledge of the death of Gallagher, the scheme and purpose of the management of the election campaign as carried on and the conduct of the election and the official declaration of the result by the county commissioners canvassing the returns, are not only amply corroborated but are affirmed by the express allegations in the answer, filed by the respondents and in the petition of the interveners. In the answers filed, after referring to the sticker campaign carried on by the relator and after mention of the fact that the vacancy in the nomination had not been filled by the party committee, it is alleged: "That, by reason of the fact, as hereinbefore alleged, that there was no central committee to fill the vacancy caused by the death of the said J. P. Gallagher, the voters of said county were precluded from voting for a candidate selected by such central committee; and that a majority of all of the registered electors of said county, and constituting approximately a two-thirds majority of all of the electors of said county voting at said election, voted for J. P. Gallagher, deceased, (being precluded through no fault of their own from voting for a candidate nominated by the Democratic central committee to fill the vacancy caused by the death of the said J. P. Gallagher), in order to prevent the election of the said relator." And in the amendments to the respondents' answer as proposed in the motion to modify the court's order, it is alleged:

"(11b), That Marguerite Gallagher, the widow of said J. P. Gallagher, deceased, declined by reason of her recent bereavement to enter into a political campaign for election to said office, but that it was the desire of the great majority of the electors of said county that she receive said office either by election or appointment; that, as alleged in relator's affidavit, the Midland Empire Farmer, a newspaper of general circulation throughout Treasure County, and the official newspaper of said county, published on the front page of its issue of October 17th, 1940, certain news articles and a copy of the official ballot to be used at the general election to be held November 5th, 1940,

whereby the voters of said county were advised that if J. P. Gallagher received the highest number of votes for said office, the board of county commissioners of said county would then fill said office by appointment, and that by said newspaper articles the voters of said county were informed that the board of county commissioners had appointed Marguerite Gallagher to said office; that the information so published was deemed and considered by the voters of said county to be official and to be true and correct by reason of the fact that the name of the said J. P. Gallagher was printed on the official ballot used at said general election as a candidate for the office of clerk of the district court.

"That the great majority of the voters of said county read said newspaper and believed the statements and representations therein set forth and contained and that they relied thereon by reason of the fact that the name of J. P. Gallagher was printed on the official ballot, and that they further believed that all votes cast by them for J. P. Gallagher would be counted against any opposing candidates, and that said belief was induced and brought about by the fact that the officials of said county charged with the printing of the official ballots caused the name of the said J. P. Gallagher, deceased, to be printed on said official ballots and thereby represented to the voters, and induced them to believe that all votes cast by them for said J. P. Gallagher, deceased, would be counted against any opposing candidate; and that they had a right to rely thereon and that they were deceived thereby; and that, relying upon the truth of said newspaper articles and being unduly influenced thereby, and further relying upon the fact that the name of J. P. Gallagher was printed upon the official ballot, four hundred (400) of the voters of said county were deceived, coerced and unduly influenced to vote for the said J. P. Gallagher and did vote for him at said general election."

And so there is no dispute over the material facts—the only controversy being as to the legal effect of the 400 votes cast for J. P. Gallagher, deceased.

Under the law of this state, in all public elections the person receiving the highest number of votes is elected. It is so provided in the Constitution (Art. IX, sec. 13), as well as by statute (sec. 795, Rev. Codes). The relator, Wolff, did receive the highest number of votes cast for any living person for the office of clerk of court. Upon that fact alone, and applying the clear provisions of the law, there should be no question of his election. But the difficulty is in disposing of the 400 votes cast for J. P. Gallagher, the dead man. The respondents contend that these votes should be counted in opposition to the votes cast for Wolff and that by reason of their numerical strength they prevented his election. That such was the belief and such was the purpose of the electors in casting these votes is very clear. They all knew that Gallagher, their regularly nominated candidate, was dead. There had been no other nomination for the office, and the Democratic party committee had made no appointment to fill the vacancy in the nomination created by Gallagher's death. And so there was no regularly selected candidate for the office and no candidate's name was printed on the ballot excepting the name of J. P. Gallagher, the dead candidate. Wolff, the relator, appears to have come forward and to have carried on a sticker campaign for his election to the office. Gallagher's widow, who was holding the office by appointment made by the county commissioners to fill the vacancy, seems to have been the choice of the 400. She, however, was not disposed to enter into a campaign for election because of her recent bereavement in the loss of her husband. Her friends, considerate of her feelings and in deference to her wishes, made no campaign for her election, but, still desiring to have her as clerk of the court, they attempted to bring it about in this other way. The plan was to have enough votes cast for the dead candidate to offset, in number, the votes cast for any living person and thereby prevent an election. And the widow would, they believed, in such event continue to hold the office by re-appointment until the vacancy could be filled at the next general election. The plan worked admirably so far as getting the votes. Out of 527, the total number of votes cast in connection

with the office of clerk of court, 400 were cast for Gallagher, the dead man, 97 for Wolff, 26 for Marguerite Gallagher, the widow, and four scattering votes.

But the trouble with it all is that the 400 friends of Mrs. Gallagher resorted to an entirely wrong method of attempting to bring about the desired result. They seem to have wholly misunderstood the purpose of holding an election, or at least they did not know how to use their ballot so as to effectively influence the selection of someone to the office to be filled. Elections are held for the purpose of selecting persons to fill public office and to give the public an opportunity to express their choice in making the selection. Casting a ballot at such an election is an affirmative act, not a negative one. You vote for some person, and though your great interest may be to defeat some candidate, that purpose can be accomplished only by voting for some person in opposition to the one you may want to defeat. The provisions of our Constitution guaranteeing the citizenry the right to vote, as well as all statutory law enacted to make the exercise of that right available, clearly show that the exercise of the right must be by affirmative action.

Article IX, section 2, of the Montana Constitution, provides that ''every person of the age of twenty-one years or over, possessing the following qualifications, shall be entitled to vote at all general elections and *for* all officers that now are, or hereafter may be, elective by the people, and, except as hereinafter provided, *upon* all questions which may be submitted to the vote of the people or electors,'' etc. The very same language as above quoted from the Constitution is written into the Codes, section 540, Revised Codes. And section 696 of the Political Code which prescribes the method by which the elector may exercise his right to vote says that ''he shall prepare his ballot by marking an 'X' in the square before the name of the person or persons *for* whom he intends to vote. * * * The elector may write in the blank spaces or paste over any other name the name of any person *for* whom he wishes to vote, and vote *for* such person by marking an 'X' before such name.'' And all through the provisions of our Code for the election of public officers the

only kind of votes that are spoken of are votes cast *for* some person.

And this court has held that the only way in which an elector may have his vote counted is by voting for someone. In *Carwile* v. *Jones*, 38 Mont. 590, 101 Pac. 153, 155, an election contest case wherein the validity of a number of ballots was in question, the court said: "The ballots now under consideration disclose that the cross is not in the square before the name of Jones, but is in the square before the blank space, left there in order that the elector might write in the name of some person for whom he desired to vote. As there was not any name written in this blank space, the elector failed to vote for anyone for the office of clerk of the district court. (*In re Ballot Marks*, 18 R. I. 822, 27 Atl. 608.)" And the ballots were held properly excluded.

In a Minnesota case the court, construing the provision of the Constitution of that state, which is similar to ours, said: "When the Constitution was framed, and as used in it, the word 'vote' meant a choice for a candidate by one constitutionally qualified to exercise a choice." And further: "The quotations made from the different cases are not chance expressions. They are indicative of the idea, which permeates all legal thought, that when a voter votes for the candidate of his choice, his vote must be counted one, and it cannot be defeated or its effect lessened, except by the vote of another elector voting for one." (*Brown* v. *Smallwood*, 130 Minn. 492, 153 N. W. 953, 956, 957, Ann. Cas. 1917C, 474, L. R. A. 1916B, 931.)

In a Michigan case, *Maynard* v. *Board of Canvassers*, 84 Mich. 228, 47 N. W. 756, 760, 11 L. R. A. 332, the court said: "Giving to the language of the Constitution its ordinary signification, it declares the principle that each elector is entitled to express his choice for representative, as well as all other officers, which is by his vote, and the manner of expressing such choice is by ballot. When he has expressed his preference in this manner, he has exhausted his privilege."

It is our opinion that a voter at the polls, unless he votes for some person, is not voting at all. A ballot cast, which does

not express the preference of the voter for some person to fill the office is a nullity, cannot be counted and cannot be given any effect in determining the result of the election, as to that office.

One who has died is no longer a person. He has ceased to exist. He can no longer function in any capacity in the affairs of this world. There is no such person. He has passed into history. His name can be used only in referring to things of the past and in revival in memory of his activities and events occurring during his lifetime. His influence may still be felt, but that all relates back to his activities while living. Therefore, the votes cast for J. P. Gallagher, who was dead and who had been dead for twenty-four days on the day of election, were not cast for anyone; they were not votes cast for any person; and we hold that all of the 400 votes so cast were an absolute nullity and can have no effect on the result of the election.

The logical, reasonable, sensible rule which we follow is stated in 18 Am. Jur. 353, section 264, as follows: "Many cases, however, applying the so-called 'English doctrine,' draw a distinction in this connection and hold that the voters who, knowing that a person is dead or ineligible to office by reason of any disqualification, give their ballots for him are deemed to throw away their votes and to mean not to vote for anyone for that office, so that the eligible candidate receiving the next highest vote is elected."

Among the cases where the distinction referred to in the above quotation is drawn, we refer to the case of *State ex rel. Bancroft* v. *Frear*, 144 Wis. 79, 128 N. W. 1068, 140 Am. St. Rep. 992, and the case of *Madden* v. *Board of Election Commissioners*, 251 Mass. 95, 146 N. E. 280, two leading cases, in both of which the same conclusion we have reached is announced.

The respondents cite cases in support of their contention that votes cast at an election, even though the candidate voted for be dead, should be given effect as votes cast for some person. In practically all of these cases the candidate died on the day of election or so recently before election day that there was no opportunity for the fact of his death becoming generally

known, and the voters acted in ignorance of his death. Those cases, therefore, are not authority for the contentions made by the respondents in this case.. Our constitutional provision and the statute law enacted in pursuance thereof are so clear that to us it would seem a departure from our law to hold that a vote cast for a dead man is voting for anyone. We would be reluctant to give effect to such votes under any circumstances, and certainly not unless it appeared that the death of the candidate had occurred at such time and under such circumstances that a controlling number of electors voted for him in ignorance of his death. That is not the case here. All the facts and circumstances of the election, as brought to the attention of the court, show conclusively that the death of Gallagher was known generally, and had been known for some time before the election. And furthermore, we are precluded from considering the case from that aspect, for, as already pointed out, the admissions and express allegations in the respondents' answers show that all of the 400 votes were cast with full knowledge of Gallagher's death, and with no intention on the part of the voters that these votes should be counted as expressing their choice of anyone to be elected to the office.

Therefore, the relator Wolff was without opposition in the election, excepting the votes cast for Marguerite Gallagher and the four scattering votes, and, having received the highest number of votes cast for any person, he was elected.

It is contended by respondents that, notwithstanding the failure of the 400 to vote for anyone, they nevertheless, in casting their ballots as they did, evinced a purpose to defeat the relator or any other person for whom votes might be cast, and that because of the overwhelming majority of their number their expression of dissent should be recognized and given effect. They rest their case in this contention upon the long established and well recognized principle of majority rule in governmental affairs wherein the people have a voice, and they contend that this rule, fundamental in our Democratic form of government, is paramount and should be recognized as controlling in this case, even with our constitutional provisions and statutory law

which might call for a different conclusion. True, the will of the majority, when properly expressed, should govern. But experience in the early beginning of popular government in this country taught that provision was needed for the orderly expression of that will, and regulatory laws were passed for orderly assembly and to give opportunity to the citizen to express his individual will effectively. And out of this have grown our election laws; and these laws, even though in their operation at times a result is obtained without the sanction of the majority, have been sustained by the courts. If there is opportunity for the majority—a like opportunity for each individual citizen to express himself in conformity with regulations that are reasonable—the principle of majority rule is not infringed upon. And the very purpose, and the effect, of these regulatory provisions is to protect the rights of the citizen in the exercise of the elective franchise and give effect to an expression of choice as made by the majority or other controlling number.

It is urged by the respondents, also, that the failure of the party committee to supply a candidate to fill the vacancy on the ticket deprived the electors of the opportunity of expressing their choice in the manner contemplated under the election laws, and this especially in view of the printing of Gallagher's name on the ballot and in the newspaper reports, all of which was misleading to them. The nomination of party candidates is a privilege and is not essential to holding an election. The selection of persons for office is not necessarily made from a list of regularly nominated candidates. The elector may vote for any person of his choice. Provision is made by law for writing in names, and the person who receives the highest number of votes is elected, whether he happens to be a regular nominee or not. In this way the freest expression of choice is given to the electorate; also the election of an officer is not made dependent upon the functioning of party organizations.

The printing of Gallagher's name on the ballot was not such an irregularity as could be declared fatal to the validity of the election. And as being misleading, all the electors knew that Gallagher was dead, and none of the votes cast for him were

intended for the purpose of naming him for the office. The newspaper publications may have been misleading, but they had no official significance and can furnish no basis for the allegation of deceit and fraud in the conduct of the election. There is nothing in the whole record that gives evidence of any obstruction of the electors whereby they were prevented in any way from having the freest exercise of their right of suffrage, and in the absence of any such showing there is no ground for holding the election illegal.

The cases cited by respondents' counsel on this phase of the case do not support his contentions. These cases all make it very clear that the law seeks to make available to the citizen the exercise of his right of suffrage and to maintain that right and give full effect to his expression of choice when he casts his ballot. And the courts, in line with that purpose, have uniformly held that when the opportunity has been given to all electors alike to express themselves freely, any irregularity in the performance of duty by election officers should not be permitted to destroy the votes of those who have cast their ballots in the manner as the law provides.

In the case of *Atkinson* v. *Roosevelt County,* 71 Mont. 165, 227 Pac. 811, 815, cited by respondents' counsel, the court said: "Ignorance, inadvertence, or even intentional wrong on the part of the judges of election should not be permitted, in the absence of fraud or collusion, to disfranchise an elector, much less an entire precinct. While it is true that irregularities invite a concealed fraud, yet, where the fault lies with the election officials rather than the elector, they should be disregarded, unless the statute expressly declares that the same is fatal to the election, or unless they are such as in themselves change or render doubtful the result of the election."

In the case of *Thompson* v. *Chapin,* 64 Mont. 376, 209 Pac. 1060, 1061, the court said: " 'The departure from the law in matters which the Legislature has not declared of vital importance must be substantial in order to vitiate the ballots. This appears to be the general current of the authorities.' "

In the case of *Miller* v. *Pennoyer*, 23 Or. 364, 31 Pac. 830, 831, a case wherein an election was contested on the ground that the county clerk had printed a candidate's name in two places on the ballot, the court held that this irregularity was not fatal to the election. The matter is discussed at length and, among other things, the court said: "Under the law, as it now exists, neither a voter nor candidate has any control or voice whatever in the arrangement and publication of the names or forms of the ballot, and the voter is either compelled to vote the 'official ballot,' as prepared by the county clerk, or not vote at all. In such case, the absence of an affirmative declaration in the statute that a ballot containing the name of a candidate in more than one place is void, and shall not be counted, we are unable to agree to the doctrine that an error of the county clerk in construing a doubtful provision of the law should disfranchise a large number of voters, who are in no way responsible for the error or mistake; and such is the effect of the decisions under similar ballot laws."

In the case of *Weber* v. *City of Helena*, 89 Mont. 109, 297 Pac. 455, 462, an election was held void because of failure to observe the law in providing for the registration of voters, and as a result of which a large number of persons who were qualified to vote were deprived of the right. In that case there was clearly a wrongful obstruction of the electors which prevented them from voting—an entirely different case from the situation here, where the irregularity in no way interfered with the exercise of that right. Mr. Justice Angstman, writing the opinion, was careful to point out the distinction, saying: "This is not a case where there has been a substantial compliance with statutory requirements * * * . We are not confronted with a situation where those conducting an election have departed from the strict letter of the law in some minor details * * * . It is not a case presenting mere irregularities in the proceedings leading up to the election. The attack is not alone upon the ground that the registration was improper or defective, nor is it a contest between candidates both of whom affirm the election. * * * The attack here is upon the ground that the entire

election was invalid because of the failure to make any attempt to comply with applicable statutes." And further: "This case falls within the exception recognized in *Goodell* v. *Judith Basin County,* 70 Mont. 222, 224 Pac. 1110, 1116, where the court adopted the following rule from *Jones* v. *State,* 153 Ind. 440, 55 N. E. 229: 'All provisions of the election law are mandatory if enforcement is sought before election in a direct proceeding for that purpose; but, after election, all should be held directory only, in support of the result, unless of a character to effect an obstruction to the free and intelligent casting of the vote, or to the ascertainment of the result, or unless the provisions affect an essential element of the election, or unless it is expressly declared by the statute that the particular act is essential to the validity of an election, or that its omission shall render it void.''

In an early case decided by this court, *State ex rel. Brooks* v. *Fransham,* 19 Mont. 273, 48 Pac. 1, 7, the very question we have here was there involved. The county clerk had erroneously printed on the general election ballot the ticket of the Silver Republican party, which was not entitled to a place on the ballot. The names of all the regular Republican nominees appeared also on the Silver Republican ticket and as candidates of that party. The Democratic candidate for sheriff was declared elected as having received more votes than the votes cast for the Republican candidate on the Republican ticket. The Republican candidate claimed that he was entitled to have counted also the votes cast for him on the Silver Republican ticket, which would give him the highest number of votes and elect him. The question was whether the error of the county clerk in printing the Silver Republican ticket on the ballot would invalidate the votes cast on that ticket. The court held it did not, and wrote a lengthy opinion with extended citation of authority and discussion of law. We quote the following from that opinion as being especially applicable to the instant case and to show that the law in this state long ago became well settled upon that point: "It is difficult to see how, under the constitution of our state (sec. 13, Art. IX), the person who re-

ceives the highest number of votes cast by qualified voters can be denied the constitutional right to the office to which he has been so elected. There is wisdom in that construction of election laws which holds rigidly to the doctrine that in our country, where the will of the people is supreme when clearly expressed, it cannot be defeated by a claim that an official neglected to properly make up the ballot published and voted. A party or candidate may be defeated by an official's wrong, but the electors must be secure in the knowledge that their votes, when legally cast, will be counted. And we cannot hold to the contrary, unless compelled to do so by mandatory provisions of law and construction requiring such votes to be held void, not in our constitution or codes.''

The printing of Gallagher's name on the ballot gave no advantage to any aspirant for the office. All the electors who voted for him knew that he was dead and so no one was misled. His name on the ballot in no way interfered with the voting by anyone for anyone at the election. It was an irregularity which, under the facts and circumstances here disclosed, in no way interfered with the free exercise of the right to vote. To hold this irregularity fatal to the election would be in direct opposition to the general rule and not in accord with the decisions of this court.

The question of jurisdiction is raised, respondents contending that mandamus will not lie in a case of this kind. The controlling question is whether the thing sought to be enforced is the performance of a ministerial act which it is clearly the legal duty of the officers to perform without any inquiry into facts on the part of the officers. Here there is no question of fact. The votes were counted by the canvassing board. The board has made its report. In this it has shown that 400 votes were cast for a dead man. How it learned this fact is immaterial. It is reported as a fact and must be taken as such by the court in considering the case. The next fact of importance is that the relator received 97 votes and that no other person received that many votes for the same office. It follows, as a matter of law, that the relator, on the basis of those returns, is

elected. The law makes it the duty of the canvassing board to issue a certificate of election to the person receiving the highest number of votes. That duty is plain and it is a legal duty made so by statute. The relator was elected and he has a constitutional right to the office. He is entitled to a certificate of election and the only way in which it can be obtained, when it is refused, is by mandamus to compel the board to act.

This is not a case of an election contest, for there is no one claiming the election against the relator. It is not a case for quo warranto proceedings, for no such action could be instituted until the time for taking office, and then only if there should be someone else there claiming the office. The person elected is entitled to the certificate of election as soon as the canvassing board has ascertained the result of the vote, so that he may make such use of it as may be necessary when he comes to take the office. In our opinion, mandamus is not only a proper remedy in this case, but the only effective remedy the relator could resort to.

The relator asks for a reasonable attorney's fee for the services rendered by his attorney in preparing and prosecuting this action. This he is entitled to, together with costs. We fix the amount of the allowance for attorney's fee at three hundred fifty dollars ($350). The respondents are county officers and we find that that they have appeared and made defense in the proceeding in good faith, and judgment for costs and attorney's fee is, under the provisions of section 9858, Revised Codes, therefore awarded against Treasure county.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ANGSTMAN and ERICKSON concur.

MR. JUSTICE MORRIS:

I dissent. I desire as briefly as possible to call attention to numerous authorities that are not in accord with the majority opinion. Some courts have held, as cited by the majority, that one who casts a vote for a dead person throws away his vote or disfranchises himself; other hold that legal votes cast for any

person disqualified are protest votes and should be included in the total of the votes in determining whether there has been cast for the person claiming the office the highest number of legal votes. I think the latter rule more in accord with former decisions of this court, as well as in harmony with the spirit of our government and the letter of the Constitution.

Section 13 of Article IX of the Constitution provides: "In all elections held by the people under this constitution, the person or persons who shall receive the highest number of legal votes shall be declared elected."

The word "person" as used in the above provision of the Constitution means of course a "living person" (*Brooks* v. *Boston etc. Ry. Co.*, 211 Mass. 277, 97 N. E. 760; *State ex rel. Bancroft* v. *Frear*, 144 Wis. 79, 128 N. W. 1068, 140 Am. St. Rep. 992), but the 400 votes cast for Gallagher were not illegal votes; they represented more than two-thirds of all the votes cast in Treasure county at the last general election. We find from the records in the office of the secretary of state that the combined total vote for all the candidates for Governor was 613, and that was the highest vote cast in that county for any candidate for a state office; 610 votes were cast for the presidential electors of all parties, and a less number for other candidates. It is obvious that the deceased candidate for clerk of the court received approximately two-thirds of all the votes cast in the county and they were not illegal votes.

It does not appear that when the votes were being cast for Gallagher and other candidates anyone challenged them and they were accepted to make up the total vote of all other candidates without question. Votes cannot be illegal in the sense referred to in the Constitution when cast for one candidate and not illegal when cast for another. An illegal vote is one cast by a person who is not entitled to vote, that is an alien, a non-resident, a minor, one convicted of a felony and not pardoned, etc.

The 613 votes cast in Treasure county at the November election for Governor were cast by the citizens of that county and it was their right to cast them in such manner as they desired.

If they chose to register the decisive protest they did against the election of Wolff for clerk of the court, that was a privilege that could not be legally denied them, nor is there any law that classifies such votes as illegal.

Running through all our various and sundry organizations, governmental, corporate, social ·and in all others where expressions are sought from members of any body entitled to have a part in the determination of any question that arises within the scope of its purposes, affecting the particular body, no question can be determined unless a majority or a plurality of those participating supports the question under consideration, and in many of such bodies, more particularly political bodies, bodies or organizations that have to do with the fundamental element of government, no act or procedure may be authorized except on the vote of a majority of all the members of the particular body, whether present or absent. The Congress of the United States cannot act unless there be a quorum present, and a quorum is a majority of all the members irrespective of the number present; the same is true of our own legislative bodies, both House and Senate; essential matters affecting the property values of corporations cannot be dealt with or any action taken relative thereto without the approval of a majority of all the stockholders. Nowhere, nor in any activity of any nature, under our system of government, can a minority bind the majority when there is present a majority that voices their opposition to the action proposed. If this be not a fundamental principle of American government, then we will have to revise all, not part, but all, of our preconceived notions of government by majority rule.

Decisions of our own court directly in point are meager, but clearly indicate an intent to follow the American rule rather than the "English doctrine" followed by the majority. The principle is quite clearly expressed in the following cases by this court: *Stackpole* v. *Hallahan*, 16 Mont. 40, 40 Pac. 80, 28 L. R. A. 502; *Cadle* v. *Town of Baker*, 51 Mont. 176, 149 Pac. 960. The clearest exposition found, I think, appears in 18 Am. Jur., sections 263 and 264, where it is said:

"Ineligibility or Death of Candidate Receiving Highest Vote.—While the cases are not in harmony as to the effect of knowledge of the voters at the time of voting that the candidate who actually receives the highest number of votes cast at an election is dead or ineligible, there is no dissent from the broad rule that in the absence of such knowledge, although the candidate voted for by a majority cannot be declared elected because of his ineligibility and the majority vote is thereby rendered ineffective for such purpose, such majority is effective to forbid the election of the candidate having the highest number of votes. [Thus rule is supported by citation of numerous authorities.] The effect is to render the purported election nugatory and to leave a vacancy in the office thus attempted to be filled. Generally, this rule also applies to cases in which the candidate for office dies between the date of nomination and that of election. Votes cast for him are not considered as counted for him, but are taken as against his opponent so far as concerns the latter's right to the office. Laws have been enacted which provide that in the event of the death or ineligibility of the majority candidate, the opposing candidate having the next highest number of votes shall be declared elected, [*State ex rel. La Follette* v. *Kohler,* 200 Wis. 518, 228 N. W. 895, 69 A. L. R. 348, is the only decision cited to sustain this rule], but such a provision is invalid where the Constitution provides that the person receiving the highest number of votes shall be elected." *McKinney* v. *Barker,* 180 Ky. 526, 203 S. W. 303, L. R. A. 1918E, 581, is cited to sustain this rule.

"The American rule has been broadly stated as making no distinction between votes cast in ignorance of the recipient's ineligibility and those given with full knowledge thereof, the minority candidate being held to be defeated in either case by the majority cast in favor of the ineligible candidate. Many cases, however, applying the so-called "English doctrine," draw a distinction in this connection and hold that voters who, knowing that a person is dead or ineligible to office by reason of any disqualification, give their ballots for him are deemed to throw away their votes and mean not to vote for any one for that office,

so that the eligible candidate receiving the next highest vote is elected. \* \* \* ''

According to American Jurisprudence it becomes obvious that the majority in the case at bar were governed by the ''English doctrine'' rather than by the majority American rule. It appears illogical to me to hold that the kind of disqualification is of decisive importance. One who receives the highest number of votes is the choice of a majority of the voters. If he be dead at election time, if he be not of legal age to hold the particular office, if he be not a legal resident of the state, the county, or the district, or if he be a person of foreign birth, and unnaturalized or for any other reason mentioned in the statutes he be not qualified to hold the office he may be ousted if he has assumed to exercise the functions thereof.

There is no logical reason why one sort of disqualification of a candidate such as in the instant case should redound to the advantage of the candidate who received the next highest number of votes than another sort of disqualification. One is qualified or he is not qualified; there are no degrees of disqualification. A and B are contestants for a particular office; A wins but is disqualified, and B, not having received the highest number of votes, cannot have the office. It is not A's disqualification that prevents B from having the office, but the fact that B was not the choice of a majority of the voters voting at the election.

In the case of *Saunders* v. *Haynes*, 13 Cal. 145, it was said: ''But if a majority of those voting, by a mistake of law or fact, happen to cast their votes upon an ineligible candidate, it by no means follows that the next to him on the poll should receive the office. If this be so, a candidate might be elected who received only a small portion of the votes, and who never could have been elected at all but for this mistake. The votes are not less legal votes because given to a person in whose behalf they cannot be counted; and the person who is the next to him on the list of candidates does not receive a plurality of votes because his competitor was ineligible. The votes cast for the latter, it is true, cannot be counted for him; but that is no reason why they should, in effect, be counted for the former,

who, possibly, could never have received them. It is fairer, more just, and more consistent, with the theory of our institutions, to hold the votes so cast as merely ineffectual for the purpose of an election, than to give them the effect of disappointing the popular will, and electing to office a man whose pretentions the people had designed to reject.''

In *Howes* v. *Perry,* 92 Ky. 260, 261, 17 S. W. 575, 576, 36 Am. St. Rep. 591, it was said: ''It is a principle of free elections by the people, firmly fixed and understood, that no person is or can be regarded duly elected to an office unless, when only two persons are voted for, he receives a majority of the votes cast for them, or receives a plurality in case there are more than two voted for. Any other rule would be subversive of the fundamental idea of elections by the people under our form of government, which is that only that person shall be entitled to hold an elective office who appears from the records of votes cast to have been the choice of a majority or plurality of those voting in such elections. There is no means of ascertaining whether S. T. Bayse had at the time of his death received more votes than the whole number given to appellant; nor is it necessary to inquire, for it is admitted by appellant he was not the choice of a majority of the qualified voters whose votes were cast in good faith, and recorded in that election, and that is enough to decide the contest against him.'' To the same effect, see *State ex rel. Dunning* v. *Giles,* (Wis.) 2 Pin. 166, 1 Chand. 112, 52 Am. Dec. 149, and note thereto; *Patten* v. *Haselton,* 164 Iowa, 645, 146 N. W. 477, 51 L. R. A. (n. s.) 226; *Sheridan* v. *City of St. Louis,* 183 Mo. 25, 81 S. W. 1082.

In my opinion the proper course for the county commissioners to have pursued was to declare the attempted election of clerk of court at the November election a nullity, appoint some person to fill the office until an election could be held and proceed to call and hold a special election to fill the office as provided by section 532, Revised Codes.

There is a further question involved that I shall not pause to consider further than to say that granting for the sake of argument that the votes cast for Gallagher were illegal, which

is the theory of the majority, it appears to me that this court, by the action taken, infringed upon the powers of the election officials. The county canvassing board, the county commissioners, has no power to revise the poll books as certified by the judges of election. If the judges of election have certified, to the county canvassing board, votes that were accepted by the judges of election as legal votes, mandamus directing the county board to correct the assumed error of election judges can obtain no legal results.

Rehearing denied February 13, 1941.