300 S.E.2d 86

**Robert R. NELSON, et al.**

v.

**The WEST VIRGINIA PUBLIC EMPLOYEES INSURANCE BOARD, et al.**

**No. 15468.**

Supreme Court of Appeals of West Virginia.

March 4, 1982.

Concurring Opinion Jan. 20, 1983.

Marjorie Martorella, Huntington, for petitioners.

Chauncey H. Browning, Atty. Gen. and Thomas Trent, Asst. Atty. Gen., Charleston, for respondents.

McGRAW, Justice:

This is an original proceeding in mandamus. The petitioners are Robert Nelson, Kathleen Via and Leoda Fortney. Petitioner Nelson is a member of the Senate of West Virginia and the chairman of the Senate Committee on Banking and Insurance. Petitioners Via and Fortney are surviving spouses of former employees of the State of West Virginia and its political subdivisions. The respondents are the West Virginia Public Employees Insurance Board, a body created and established in 1971 under the provisions of W.Va.Code § 5–16–3 (1979 Replacement Vol.) to provide group health and life insurance for all public employees, and Board members Glen B. Gainer, Jr., Auditor of the State of West Virginia, Gretchen Lewis State Workmen's Compensation Commissioner, and Larrie Bailey, Treasurer of the State of West Virginia. The petitioners seek to compel the respondents to comply with the provisions of W.Va.Code § 5–16–18 (1979 Replacement Vol.) which directs the Board to promulgate rules and regulations providing for

the participation of dependents of deceased members of the group insurance plan administered by the Board. We find that the respondents have not fulfilled the mandate imposed by statute and award the writ.

Petitioner Via's husband was an employee of the Cabell County Board of Education for 37 years until his retirement in June of 1978. Petitioner Fortney's husband was an employee of the State of West Virginia for 42 years until he retired in August of 1981. Mr. Via and Mr. Fortney were participating members in the Board's Public Employees Group Insurance Plan during their years of employment. Upon retiring, both men elected to continue to participate in the insurance plan and paid to the Board the monthly premiums for continuing full coverage. Mr. Via died in May of 1981, and Mr. Fortney died in August of 1981. Both Mrs. Via and Mrs. Fortney wished to continue to participate in the group insurance plan, but were told that they could purchase insurance coverage under the Board's plan for only 90 days after their husbands' deaths. These petitioners purchased full coverage under the Board's plan for the three months following the death of their spouses, but were not permitted to participate in the plan thereafter. It is not contested that Mrs. Via and Mrs. Fortney were dependent spouses of their deceased husbands.

Mrs. Via contacted Senator Robert Nelson and informed him that her benefits under the Board's insurance plan had been terminated. Before the 1982 regular session of the West Virginia Legislature, the Senator had a bill drafted to provide for continued coverage of the dependents of deceased members of the insurance plan, but, upon introducing the bill to the Senate, discovered that an existing statute, W.Va. Code § 5–16–18 (1979 Replacement Vol.), already provided for such extended coverage. The Senator wrote to the executive secretary of the Board requesting an explanation for the Board's failure to extend coverage to dependents of deceased employees. In reply, the executive secretary admitted that the Board was fully aware that the law provided for extended coverage to dependents of deceased members, but indicated that it had been the policy of the Board since the inception of the program in 1972 to allow participation of such persons in the program only for a limited time following the death of the plan member.

The Senator found this response unacceptable and informed the executive secretary that extending an option to the dependents of deceased members to pay premiums and continue coverage was not a discretionary function of the Board, but, rather, was mandated by statute. Thereafter, Senator Nelson, Mrs. Via and Mrs. Fortney filed this petition for a writ of mandamus to compel the Board to: (1) reinstate coverage for dependents who have been wrongly terminated from group coverage; (2) cease forthwith from terminating citizens of the State entitled to group insurance under the law; (3) adopt rules and regulations permitting dependents of deceased members of the Public Employees Group Insurance Plan to continue participation and coverage in the plan to the same extent as any public employee or member of the group, upon payment of total cost for coverage; and (4) terminate from employment those administrators who have knowingly and willfully terminated from coverage citizens whom they knew were entitled to benefits under the law. The petitioners also pray for court costs and attorney fees and such other further and general relief as may seem proper.

The Public Employees Insurance Board was established by the Legislature in 1971 "to provide major medical insurance, and group life and accidental death insurance for all employees" of the State and its political subdivisions, including elected officers. W.Va.Code § 5–16–3 (1979 Replacement Vol.). The statute we are here asked to consider mandates that the Board extend the opportunity to participate voluntarily in the group insurance plan to retired employees, their spouses and dependents and the dependents of any deceased member:

The board *shall* promulgate such rules and regulations as may be required for the effective administration of the provisions of this article....

Such regulations *shall provide that ... the dependents of any deceased member shall be entitled to continue their participation and coverage upon payment of the total cost for such coverage ....* (Emphasis added.) W.Va. Code § 5–16–18 [1972].

█ It is well established that the word "shall," in the absence of language in the statute showing a contrary intent on the part of the Legislature, should be afforded a mandatory connotation. *See Cooper v. Gwinn*, 171 W.Va. 245, 298 S.E.2d 781 (1981); *Woodring v. Whyte*, 161 W.Va. 262, 242 S.E.2d 238 (1978); *Terry v. Sencindiver*, 153 W.Va. 651, 171 S.E.2d 480 (1969).

The Board, by its answer, admits that it is required by W.Va.Code § 5–16–18 to extend optional coverage under its group plan to petitioners Via and Fortney, and other surviving dependents of deceased members. The Board contends, however, that the issues raised by the petitioners have been resolved by the Board's approval of a resolution proposing extension of coverage to surviving spouses and dependents of deceased covered members, and therefore moves to discharge the rule to show cause. The petitioners resist this motion contending the resolution, which was adopted after the petition herein was filed, is unclear with respect to the cost of coverage for dependents of deceased employees. The petitioners' concern is understandable. The resolution would be unacceptable if it places surviving spouses and dependents in a unique category of special risk participants, thereby destroying the character and purpose of the group insurance plan in opposition to the public policy statement of the relevant statutes.

The purpose of a group health insurance plan is to provide insurance protection at the lowest possible participant cost. The low participant cost is achieved by the efficiencies of administration inherent in issuing insurance to groups, and by the distribution of risk over the entire participating group.

█ The West Virginia plan is especially attractive to the employee for it provides that upon the death of the employee, his dependents "shall be entitled to continue their participation and coverage upon payment of the total cost for such coverage." W.Va.Code § 5–16–18. The public employee who participates in the group insurance plan authorized by the act should be secure in his belief that after his death his family will continue to receive adequate insurance protection at low group rates. The employee's survivors have a constitutional right to the benefits provided by extant statute. *See Cooper v. Gwinn, supra.*

However if the Board creates a unique category of special risk for surviving spouses and dependents it substantially reduces, if not eliminates, the advantages of group insurance to those dependents in a manner which is not contemplated by the act. The statutes contemplate that spouses and dependents of deceased employees will be entitled to continue to participate in the insurance plan at the same average premium rate chargeable to the members of the pool of which their decedents were members. Otherwise the size of the dependents' class and the number of claims that can be expected from a group with its characteristics will raise their premium rate to such a level as to eviscerate the advantages that normally attend participation in a group insurance plan.

█ While it is true that the Board is authorized to separately rate for claims experience purposes "any ... categorization which would insure the stability of the overall program," W.Va.Code § 5–16–7 (1979 Replacement Vol.), this authorization does not permit the establishment of categories which defeat the inherent purposes of group insurance plans. We do not believe that the Legislature intended by enactment of this language to permit the Board to disenfranchise spouses and dependents of deceased employees from the benefits of the group insurance plans which are authorized by the act.

█ W.Va.Code § 5–16–18 bestows upon the petitioners, and all other spouses and dependents of deceased members of the West Virginia Public Employees Group In-

surance Plan, a clear right to continue their participation and coverage in the group insurance plan administered by the West Virginia Public Employees Insurance Board. The language of the statute is mandatory, and therefore also imposes a non-discretionary legal duty on the part of the respondents to extend coverage to the petitioners. The resolution adopted by the Board on February 4, 1982 would not be an adequate remedy if it places a burden upon the petitioners, and similarly situated persons, which is not contemplated by the West Virginia Public Employees Insurance Act. The Legislature has mandated that "dependents of any deceased member *shall* be entitled to continue their participation and coverage ...." (Emphasis added.) W.Va.Code § 5–16–18. It is the Board's duty to fulfill that mandate. The petitioners are therefore entitled to a writ of mandamus requiring the respondents to: (1) reinstate coverage for spouses and dependents of deceased members who have been wrongfully terminated from group coverage; (2) cease forthwith from terminating from coverage those spouses and dependents of deceased members entitled to group insurance by law; and (3) adjust the rules and regulations to permit dependents of deceased members of the Public Employees Group Insurance Plan to continue participation in the plan at the same average premium rate chargeable to members of the pool of which their decedents were members.

■ Included in the petitioners' prayer for relief is the request that this Court "terminate from employment those administrators who have knowingly and willfully terminated from coverage citizens whom they knew were entitled to benefits under the law." We appreciate the petitioners' view that the respondents have not acted properly in applying the law and in carrying out the public policy established by the Legislature. The petitioners are correct to expect that the acceptance of every public office implies an agreement on the part of the officer that he will execute its duties with diligence and fidelity. *Green v. Jones,* 144 W.Va. 276, 108 S.E.2d 1, *adhered to on rehearing,* 144 W.Va. 276, 295,

110 S.E.2d 329 (1959). As we stated in *State ex rel. Preissler v. Dostert,* 163 W.Va. 719, 260 S.E.2d 279 (1979):

> One who accepts a public office does so *cum onere,* that is, he assumes the burdens and obligations of the office as well as its benefits, subjects himself to all constitutional and legislative provisions relating to the office, and undertakes to perform all duties imposed on its occupant; and while he remains in such office he must perform all such duties. 163 W.Va. at 730, 260 S.E.2d at 286.

We elaborated upon the duties of public officers in *Cooper v. Gwinn, supra:*

> The responsibility of all public officials is to execute their duties as the Legislature, through law, instructs .... [A]n executive officer ... has the constitutional duty to "take care that the laws be faithfully executed." W.Va. Const. art. 7, § 5. Our Constitution does not permit executive officers to pick and choose the laws they will or will not execute, for if such were the case, the executive department could, either by commission or omission, model a system of law different than that specified by the people acting through the Legislature. So long as a legislative enactment as law exists, the executive department has the constitutional duty to attend to its faithful execution. *Cooper v. Gwinn, supra* at 789.

The American form of republican government contemplates that public policy expressions of the people as enacted by the Legislature in law are binding upon officers of the executive branch of government in the discharge of their duties. Executive department officers may not disregard a clear legislative mandate embodied in a statute. *See Cooper v. Gwinn, supra,* for a discursive treatment of the theory of republican government as guaranteed by article IV, section 4 of the United States Constitution and as embodied in the West Virginia Constitution.

In this case the respondents admit that they have failed to implement the legislative mandate of W.Va.Code § 5–16–18 in

knowing disregard of the statute's requirements. Our constitution provides that public officers may be removed from office for "official misconduct, incompetence, neglect of duty, or gross immorality . . . ." W.Va. Const. art. 4, § 6. Willful or negligent violation of a statute has been held to constitute grounds for removal of a public officer. *Wysong v. Walden*, 120 W.Va. 122, 52 S.E.2d 392 (1938); *Ball v. Toler*, 109 W.Va. 61, 153 S.E. 238 (1930).

■ However, this is not a proper proceeding in which removal can be effected. All of the respondents serve as members of the West Virginia Public Employees Insurance Board by statutory mandate. W.Va. Code § 5-16-5 (1979 Replacement Vol.). Two of the respondents are executive officers who are elected to their respective offices of auditor and treasurer. W.Va. Const. art. 7, § 1. Under the provisions of W.Va.Code §§ 6-6-5 and 6-6-6 (1979 Replacement Vol.), jurisdiction for removal of these officers is given to the Governor as chief executive officer of the State. The other named respondent is an executive officer appointed by the Governor to the office of workmen's compensation commissioner. W.Va.Code § 23-1-1 (1981 Replacement Vol.); W.Va.Code § 6-7-2a (Cum.Supp.1981). Under the provisions of article 7, section 10 of the West Virginia Constitution and W.Va.Code § 6-6-4 (1979 Replacement Vol.) jurisdiction for removal of officers appointed by the Governor is also vested in the Governor. The executive secretary and other administrative personnel of the Board, who are not named respondents herein, are appointed by the Board itself. W.Va.Code § 5-16-6 (1979 Replacement Vol.). Thus jurisdiction for the removal of these personnel lies first with the Board and next with the Governor. The jurisdiction of this Court under the statutory procedure is appellate, not original. *See* W.Va. Const. art. 3, § 17; art. 8, § 3.

■ Finally, the petitioners request an award for court costs and attorney fees. As a general rule awards of costs and attorney fees are not recoverable in the absence of a provision for their allowance in a statute or court rule. *See, e.g., Burdette v. Campbell*, 126 W.Va. 591, 30 S.E.2d 713 (1944); *see generally*, 1 S. Speiser, *Attorneys' Fees* § 12:3 (1973) and cases cited therein. By statute in West Virginia the writ of mandamus may be awarded with or without costs as the court or judge may determine. W.Va.Code § 53-1-8 (1981 Replacement Vol.). Ordinarily, in mandamus proceedings, costs will not be awarded against a public officer who is honestly and in good faith endeavoring to perform his duty as he conceives it to be. *State ex rel. Koontz v. Board of Park Commissioners of City of Huntington*, 131 W.Va. 417, 47 S.E.2d 689 (1948). However, it is settled that in mandamus proceedings where a public officer willfully fails to obey the law, costs will be awarded. *See, e.g., State ex rel. Board of Education v. Cavendish*, 81 W.Va. 266, 94 S.E. 149 (1917). The respondents herein admit that they have willfully disregarded the mandatory provisions of W.Va.Code § 5-16-18. Accordingly, an award of costs against them is justified.

The general rule denying awards of attorney fees has developed primarily in the context of civil litigation dealing with controversies between private parties. *See* 1 S. Speiser, *supra* at § 12:4. There are few cases discussing such awards in the context of extraordinary proceedings, as mandamus, where public officers are parties to the action. Generally those jurisdictions which have addressed the issue have adhered to the traditional rule denying attorney fees in the absence of express statutory authorization. *See State ex rel. Roberson v. Board of Education*, 70 N.M. 261, 372 P.2d 832 (1962); *State ex rel. Ray v. South*, 176 Ohio St. 241, 27 Ohio Ops.2d 133, 198 N.E.2d 919 (1964); *State ex rel. Pacific Bridge Co. v. Washington Toll Bridge Authority*, 8 Wash.2d 337, 112 P.2d 135 (1941). However, some jurisdictions have permitted awards of attorney fees in mandamus proceedings where the statute permits recovery of "costs" or "damages." *See Cities Service Oil Co. v. Board of City Commissioners*, 224 Kan. 183, 578 P.2d 718 (1978); *State ex rel. Wolff v. Geurkind*, 111 Mont. 417, 109 P.2d 1094 (1941);

*Colorado Development Co. v. Creer*, 96 Utah 1, 80 P.2d 914, *reh. den.* 96 Utah 19, 84 P.2d 785 (1938).

This Court has previously held that attorney fees are not "costs," *State ex rel. Citizens Nat'l Bank v. Graham*, 68 W.Va. 1, 69 S.E. 301 (1910), and thus attorney fees would not ordinarily be recoverable as such. Nevertheless the petitioners' request for attorney fees has merit. Our statutory law does not contemplate that officers of the executive branch of government, after taking their oath, W.Va. Const. art. 4, § 5; W.Va.Code § 6-1-3 (1979 Replacement Vol.), will knowingly disregard their duty to faithfully execute the law. It is implicit in our system of government that public officers will perform their duties in accordance with statute. Indeed, the constitution explicitly contemplates and mandates that public officers *"shall* perform such duties as may be prescribed by law." (Emphasis added.) W.Va. Const. art. 7, § 1. Citizens should not have to resort to lawsuits to force government officials to perform their legally prescribed non-discretionary duties. When, however, resort to such action is necessary to cure willful disregard of law, the government ought to bear the reasonable expense incurred by the citizen in maintaining the action. No individual citizen ought to bear the legal expense incurred in requiring the government to do its job.

 A well established exception to the general rule prohibiting the award of attorney fees in the absence of statutory authorization, allows the assessment of fees against a losing party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *See, e.g., Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *see also, Annot.*, 31 A.L.R.Fed. 833 (1977). The actions of the respondents evidence a deliberate disregard for the mandatory provisions of W.Va.Code § 5-16-18. As a result of the respondents' willful evasion of the law, the petitioners were forced to hire a lawyer and go to court to get what they were clearly entitled to by statute. The respondents' refusal to perform their clear statutory duty justifies an award of attorney fees. *Cf. State ex rel. Koontz v. Board of Park Commissioners of City of Huntington, supra.* We therefore hold that the petitioners herein are entitled to reasonable attorney fees expended in the prosecution of this action. In mandamus proceedings where a public officer willfully fails to obey the law, attorney fees will be awarded. The reasonableness of the attorney fees sought to be recovered will be determined by reference to the factors set out in Disciplinary Rule 2-106 of our Code of Professional Responsibility. *See Farley v. Zapata Coal Corp.*, 167 W.Va. 630, 281 S.E.2d 238 (1981).

For the foregoing reasons we award a writ of mandamus and order the respondents to (1) immediately reinstate coverage for spouses and dependents of deceased members who have been wrongfully terminated from group coverage in violation of W.Va.Code § 5-16-18; (2) cease forthwith from terminating from coverage those spouses and dependents of deceased members who desire to continue coverage in the group insurance plan; (3) adjust the rules and regulations to permit dependents of deceased members of the Public Employees Group Insurance Plan to continue participation in the plan by payment of the total cost of their coverage at the same average premium rate chargeable to members of the pool of which their decedents were members; and (4) pay the petitioners' costs and reasonable attorney fees.

Writ awarded.

NEELY, Justice, concurring:

As a general rule in America the private litigation expenses of a winning party cannot be transferred to the losing party. In contravention of this general rule, the majority opinion has awarded attorneys' fees to the appellants. Because I believe that there are substantial policy reasons for a move in this direction, I agree with the majority. In this concurring opinion I should like to illuminate further my reasons for joining with the majority in their

holding concerning attorneys' fees. But I first disassociate myself from that part of the majority opinion that suggests any willfully improper behavior on the part of the Public Employees Insurance Board.

In the instant case the petitioner-spouses brought an action to compel government officials to perform nondiscretionary duties. For strong policy reasons they are entitled to an award of their attorneys' fees. As the majority stated at 171 W.Va. 451, 300 S.E.2d 92: "No individual citizen ought to bear the legal expense incurred in requiring the government to do its job." I believe that we could go further than the majority has gone, however, and serve a broader policy. The impact of attorneys' fees on the structure of litigation, from the initial client interview through trial to appeal, can hardly be overstated. Cost considerations pervade every move an attorney makes for his clients and every bit of advice he gives them. An intelligently designed program of fee-shifting, derived from principled standards permitting the award of attorneys' fees on a broader basis, could serve as a catalyst for a healthier legal system. "Legal 'rights' are 'airy nothing' when they are enforceable only in theory; they are 'bodied forth' when they function realistically." Hornstein, "Legal Therapeutics—The 'Salvage' Factor in Counsel Fee Awards," 69 *Harv.L.Rev.* 658 (1956).

In order to remove certain cost-related impediments to court access we must derive these principled standards, and to do that we must look to the institutional foundation for the general rule that a winning party cannot recover private costs against the losing party. An understanding of the justification for that rule will lead to an understanding of where we may suspend the rule without damaging the policies it serves.

### I

There are important considerations that militate in favor of the so-called "American rule" in certain situations. First and foremost is that the American rule against fee shifting prevents the harassment of petty debtors whose indebtedness, though minor, is not in real dispute. Tenants, alimony payers, and retail customers are all permitted to default until the amount owed is sufficient to make hauling them into court economically feasible.[1] In the alternative system, a minor debtor might be buried under an avalanche of attorneys' fees from over-eager creditors, amounting, perhaps, to many times the original obligation.[2] A strict Puritan might find this *de facto* legal excuse of minor obligations irritatingly at odds with his philosophy, but the current approach is clearly the lesser of two evils. The refusal to award attorneys' fees can be seen, thus, as an implementation of a social policy protecting small debtors from their creditors.

The American rule also implements a policy in favor of control over one's own expenses. A litigant may budget his attorneys' fees, and know that, whatever happens, he will not be forced over that figure

---

**1.** "The no-fee rule may deter resort to the courts where the legal claim is clear and the facts are undisputed but the amount likely to be recovered insufficient to reimburse the plaintiff for the costs of litigation in the absence of an award of attorneys' fees. In this situation, the no-fee rule may serve to screen out cases where the amount claimed does not justify the expenditure of additional public and private resources in order to pursue a claim to judgment. *See* Posner, *An Economic Approach to Legal Procedure and Judicial Administration*, 2 J. LEGAL STUD. 399, 439 (1973), where the author reasons that a fee-shifting rule may result in "socially unjustified litigation—litigation that costs more than the errors that would result from failure to enforce a class of meritorious claims." A

no-fee rule may thus function as a sort of flexible self-administered minimum-amount-in-controversy requirement."
Walthall, "Awards of Attorneys' Fees in the Absence of a Statute: Funds & Prospects in the Fifth Circuit," 10 *Cumb.L.Rev.* 359, 366 (1979).

**2.** The costs of securing the judgment might alone amount to more than the debt. In addition, the costs of tracking down the defendant, making an inventory of his personal property, listing his exemptions, and selling his non-exempt property to satisfy the judgment could all be considered under the rubric of attorneys' fees as well. Adding all these other costs into the calculation would inflate the final judgment to many times the amount of the original debt.

by the uncontrolled cost of his opponent's counsel. Thus a litigant's purse is protected by the American rule.[3]

Furthermore, an eventual loser's refusal to recognize the validity of the eventual winner's position, and his insistence on taking the winner to court, do not necessarily imply wrongful conduct on the part of the loser. After all, the loser calculated his chances of winning as sufficiently promising to put up his own attorneys' fees. And even where lawyers take a case on a contingent fee, the lawyer has usually calculated the chance of winning as sufficiently strong to warrant his time and effort.

## II

In litigation where there is no real dispute, however, litigation itself necessarily has a value to one of the parties. The most frequent advantage of litigation *per se* to a wrongdoer is use of the contested money while the case proceeds glacially through the court system. This benefit is then reflected in the settlement process, in that a plaintiff is willing to settle for substantially less than he may be due in order to avoid the delays of the cumbersome procedure, and the expense of maintaining legal representation throughout.

So long as there exists a *bona fide* dispute among the parties, the American rule should probably apply. However in suits where a court is not called on to resolve a conflict, but merely to enforce a rule or to point out that there is no dispute and make an award, a rule indemnifying a party for his attorneys' fees can provide important benefits.

At the moment, overburdened courts, because of the principle of open access, are powerless to resist the attraction to the public that litigation *per se* presents. An indemnity rule can be used to eliminate or counterbalance the illegitimate advantages of litigation, and thus restore some proportionality between parties' enthusiasm for litigation and the merits of their claims. As Sir Arthur Goodhart concluded, it should be possible "to adopt a modified system of substantial costs which, while limiting the discretionary element, would nevertheless prevent the abuse of the legal process which follows from the American system." Goodhart, "Costs," 38 *Yale L.J.* 849, at 877 [1929]. In order to do so, however, we must not approach the allocation of costs ritualistically, but rather in a functional way that discriminates among different classes of cases. A modification of the American rule to permit the award of attorneys' fees to the "winner"[4] where the other party has forced the litigation of a non-dispute from corrupt motives would accomplish this purpose.

## III

In order to avoid exacerbating the effects of wealth on one's prospects of having justice done, we have a strong egalitarian tradition of completely free access to our courts. *See, e.g., Johnson v. Stevens,* 164 W.Va. 703, 265 S.E.2d 764 (1980) (referring to *W.Va. Const.,* art. III, §§ 10 and 17 and the Fourteenth Amendment of the *Constitution of the United States*). While the wealthy may be able to hire lawyers, they cannot hire a court. This is an unquestionably proper posture, but as grounds for an argument against a principled use of fee-shifting it fails.

Free access to courts is a principle predicated on the erroneous assumption that both litigants in all lawsuits have a good faith dispute. Often this is not the case, and where it is not, the mischief must be discouraged. Courts are available free of charge, so they are overused. Their overuse in turn congests the docket, resulting in justice-defying delays. In a court sys-

---

**3.** *See also Day v. Woodworth,* 13 How. (U.S.) 363, 14 L.Ed. 181 (1851) (suggesting that fair play demanded that no additional burden be placed on the party unfortunate enough to be the losing party).

**4.** The concepts of winning and losing are, of course, relative, and this should be recognized in any discussion of the attorney's fee issue. A nominal award to a plaintiff often represents a "verdict for the defendant perversely expressed." *See Coakley v. Marple,* 152 W.Va. 68, 159 S.E.2d 378 (1968); *Freshwater v. Booth,* 160 W.Va. 156, 233 S.E.2d 312 (1977).

tem burdened, even compromised, by congestion and delay we need to be particularly sensitive to mischievous overuse of the courts. Litigation designed simply to impede a party seeking payment of an obligation, spiteful and vexatious suits—these simply do not belong in court.

At present there is no incentive *not* to abuse the system and, through the litigation of non-disputes, accomplish corrupt purposes. A willingness to litigate for years and sustain high litigation expenses, therefore, is frequently a profit-making venture for a wrongdoer in a case where there is a large and almost completely certain liability. A fee-shifting doctrine could control these abuses, clearing nondisputes from court dockets and eliminating the threat of prolonged litigation as a factor of the settlement calculus.[5]

Everyone who has a good faith dispute requiring a decision by an impartial arbiter is entitled to his day in court. On the other hand, every person is not entitled to his day in court regardless of the frivolous nature of the suit. Parties whose interest in the legal process is to oppress or cheat others should be discouraged. Non-disputes should, of course, be filtered out of the legal process by the subjective decision of the litigants themselves or else by their attorneys. Where they are not, courts and juries, which specialize in determining the question of good faith, are capable of distinguishing good faith disputes from non-

disputes and assessing an appropriate penalty in the form of an award of attorneys' fees.[6]

## IV

Tinkering with some user-based allocations of litigation costs can be done without challenging the fundamentally public nature of the courts. Depending on the pattern of abuse, courts will have to manipulate the fee-shifting doctrine to take into account different types of cases. In domestic relations cases, for instance, both parties generally sincerely believe themselves in the right, and generally both parties are to some degree in the right. Many other types of cases taken to court, however, are nondisputes in which one party knows from the start that he is in the wrong, but wishes to delay the eventual result or diminish the eventual payment. One of the best examples is that of the policyholder who is made to sue an insurance company to recover for damages to his property. Insurance companies attempting to wear out policyholders, and hoping that policyholders will accept less than full value, frequently require the filling out of elaborate forms, argue, delay, and attempt to intimidate policyholders with the spectre of a court battle. Unless a company has a reason to suspect fraud, the nuisance of this cumbersome procedure very likely constitutes its only value to the company.

**5.** Mine is not the first mind that this thought has crossed:

> In England the costs which the unsuccessful party has to pay consist (in substance) in the expense he has wrongfully made the other party incur; in other words, the unsuccessful party in England has to pay his opponent's lawyer's bill as well as his own. The possibility of having to pay the lawyer's bill of both parties to the action makes a plaintiff think twice before he sues out a writ and a defendant think twice before he defends an action which *ought not to be defended,* and that is a direct deterrent on the number of cases put or kept in suit, (emphasis added).

*First Report of the Judicial Council of Massachusetts,* published in 11 *Mass.L.Q.* 7, 63 (1925).

**6.** This is analogous to our discussion in *Mason County Bd. of Educ. v. State Superintendent of Schools and Bright McCausland,* 170 W.Va. 632,

295 S.E.2d 719 (1982) concerning an employee's "duty" to mitigate his damages. A "duty" to proceed in good faith could be read in the same way as the "duty" to mitigate.

> The employee is in fact under no affirmative "duty" to seek employment; he may seek it or not, at his pleasure. However, should employment similar to that contemplated by his breached contract be locally available to him, he will be charged in mitigation of his damages, the amount of the salary he would have earned at that employment. More accurately, then, the "duty to mitigate" is a limitation on his recovery dictated by the local job market.

Similarly, while a person may, at his pleasure, have his day in court, he must be aware that there is a built-in risk that he will have to pay his opponent's attorney fees as well as his own. Thus everyone is still entitled to his day in court, but along with the privilege comes a sanction when that privilege is abused.

In personal injury suits, the prospect of substantial jury awards for rather nebulous components of the injury such as pain and suffering or loss of consortium operates as a countervailing incentive against the defendant going all the way to trial. In contract disputes, property damage claims and actions for alimony payments, the precision with which the exact damages may be determined prevents this kind of a disincentive from operating. The jury is bound to the value of the pecuniary loss, from which the successful plaintiff must then deduct his attorneys' fees.[7]

Although the manifest complexity of the realm of possible configurations in which a viable claim for attorneys' fees may be presented militates in favor of extreme caution in the foreordination of approved circumstances, a number of conclusions may safely be drawn.

First, with respect to debt cases, spreading the cost of minor defaults onto the credit industry is preferable as a matter of social policy to a system that would permit minor debtors to be systematically hunted to the ground and then charged with the costs of capture. Fee-shifting is inappropriate in such cases because in the consumer credit business and residential rental property business there is a statistical parameter for bad debts. This statistical parameter amounts to a type of social insurance by which debtors as a class pay for defaulters. And since everyone can lose his job and fall on hard times, the rule that forbids the shifting of collection costs works more or less equitably.

Personal injury cases are also inappropriate for fee-shifting. Litigation is a game one can afford to play only if one can afford to lose. Personal injury suits would be discouraged if the price of loss were raised by the possibility of one's being stuck with the defendant's attorneys' fees in the event the suit were unsuccessful. And, as discussed *supra,* a good part of a defendant's incentive to delay is removed by the weighting of the balance in favor of the plaintiff at trial.

Property damage suits, contract claims, and actions to recover alimony or back pay provide more fertile ground for fee-shifting principles. In such cases the administration of justice and the principle of full and fair recovery would both be served by adopting fee-shifting as an approved judicial response to the litigation of what to the court appears to be a non-dispute.

## V

Although there is substantial hostility to the adoption of an indemnity rule, an adoption of such a rule in limited circumstances should come as no surprise to observers of the American legal landscape. Many commentators have long advocated that, in the interest of a full and just recovery, the award to the prevailing litigant must be increased to include his or her attorneys' fees, as in the English system.

The ideal of the law is that in civil actions the wronged person shall be made whole, at least so far as that can be

---

7. This Court has recently held that, in property damage claims, "annoyance and inconvenience are properly considered as elements in the measure of damages that plaintiffs are entitled to recover." *Jarrett v. E.L. Harper & Son, Inc.,* 160 W.Va. 399, at 404, 235 S.E.2d 362, at 365 (1977). Although award of attorneys' fees was not mentioned in the majority opinion, the flexibility of the concepts of annoyance and inconvenience now permits juries in property damage cases to manipulate the amount of the award in a manner that will effectively shift attorneys' fees to the losing defendant. The "wild card" factor a jury adds to the judicial process is well described in *United States v. Dougherty,* 473 F.2d 1113 (D.C.Cir.1972). Although the opinion concerned itself with the issue of jury nullification, its explanation of the process is nonetheless apt.

The jury knows well enough that its prerogative is not limited to the choices articulated in the formal instructions of the court. The jury gets its understanding as to the arrangements in the legal system from more than one voice. There is the formal communication from the judge. There is the informal communication from the total culture—literature (novel, drama, film, and television); current comment (newspapers, magazines, and television); conversation; and of course, history and tradition. *The totality of input generally convey adequately enough the idea of prerogative* of freedom in an occasional case to depart from what the judge says.

*Id.,* at 1135 (emphasis added).

accomplished, with money. It is strange then that the American legal system maintains a practice which deliberately frustrates the attainment of this ideal. Be his case ever so strong, the prevailing party to a lawsuit generally cannot recover his attorney fees used in prosecuting or defending his legal rights. Stoebuck, "Counsel Fees Included in Costs: A Logical Development," 38 *U.Colo L.Rev.* 202, 203 (1966); *See also* Goodhart, "Costs," *supra;* Kuenzel, "The Attorney's Fee: Why Not a Cost of Litigation?" 49 *Iowa L.Rev.* 75 (1963); Ehrenzweig, "Reimbursement of Counsel Fees and the Great Society," 54 *Calif.L.Rev.* 792 (1966).

Furthermore, American law can hardly be said to demand that a party necessarily pay his own fees. Lawsuits where the fee is shifted to the government, to the private sector, or to successful litigants as a group may well outnumber lawsuits paid for out of the present litigant's pocket.

Attorneys' fees are shifted to the government by government funded legal aid and by representation afforded pursuant to constitutional "due process" requirements. Law firm practices establish the other fee-shifting arrangements. The private sector (generally in the form of a law firm's other clients) foots the bill for the *pro bono* work most respectable law firms perform. More importantly, the winners of cases taken on a contingent-fee basis as a class bear the costs for losers in cases taken on contingency.

These patterns of fee-shifting are distinct from the pure indemnity system in that the costs of the litigation are absorbed by an entire class and not dropped in any individual's lap, but they show the broad acceptance in our society of the practice of fee-shifting, at least *away* from a party if not onto one. Within a narrower range, we also countenance shifting attorney's fees onto a party. *W.Va.Code,* 48–2–13 [1977] authorizes trial courts to make any order that may be proper to compel a spouse to pay sums necessary to allow the other

spouse to prosecute or defend a domestic relations suit. Rules of court expressly authorize the award of attorney's fees in certain circumstances. *See W.Va.R.Civ.P.* 30(d) (regarding oral depositions); *W.Va.R. Civ.P.* 37 (regarding e.g., failure to admit, to attend depositions, to serve answers to interrogatories, or to respond to requests for inspections). Our case law has long recognized that, in appropriate cases, attorneys' fees may be awarded to the prevailing litigant. In syllabus 2 of *Roach v. Wallins Creek Collieries Co.,* 111 W.Va. 1, 160 S.E. 860 (1931), this Court stated that "a court [may] require one party to contribute to the fees of counsel of another party ... where the plaintiff, suing in behalf of himself and others of the same class, discovers or creates a fund which enures to the benefit of all."

Attorneys' fees may also be awarded by agreement of the parties. It is a common practice now to insert attorney fee clauses in contracts, notes, mortgages, and like instruments. In *Moore v. Johnson Service Co.,* 158 W.Va. 808, 219 S.E.2d 315 (1975), we expressly approved this practice, enforcing a commercial lease contract in which the parties had agreed that the successful party in an action to enforce the lease should recover attorneys' fees from the unsuccessful party:

In the context of complex business dealings resulting in the execution of lease agreements, it is to be anticipated, despite the best efforts of the parties, that occasional disputes may require resolution by the courts. When these disputes are submitted for judicial determination, in our view, it is far better that the courts and judges receive the benefit of the expressed intentions of the parties ascertainable from the plain provision of the contract.

*Id.,* 158 W.Va. at 819–820, 219 S.E.2d at 322–23.

The conclusion to be drawn from these illustrations is that the shifting of attorneys' fees is hardly a novelty in our judicial system.[8] The problems that could be

---

**8.** In such a context, lawyers who feign horror at the mention of fee-shifting begin to resemble "Casablanca's" Louis who, pocketing his win-

nings, announces that he is "shocked, shocked to find that there is gambling here."

solved by a broader adoption of fee-shifting principles militate in favor of further inquiries into the proper engineering of such principles.

There are two components to the cost of courts: the publicly-funded administrative cost of the courts and the private costs to the parties of trying the particular case. The public nature of the former expense is easily accepted.[9] With regard to the latter, and particularly with regard to attorneys' fees, we have an opportunity to devise ways to discourage non-dispute litigation without discouraging the litigation of real disputes.

## VI

While the general rule that forbids the recovery of costs by a winning litigant probably works better than any other general rule, we do not need a general rule. A principled set of standards for selecting between fee-shifting and not will permit us to avoid the evils inherent in either alternative.

The real merit of a judicial rule, its true eloquence, is not measured by its use in court proceedings, but by its effect on potential litigants in the interim between an injury and a decision to litigate. The best rules are those that encourage parties to treat one another in a decent and civilized manner when they are not under the direct supervision of a court. The evil of frivolous, corruptly-motivated litigation in the court system is compounded by the additional delay legitimate clients of the courts are forced to bear while frivolous suits are heard. A rule discouraging such suits would combat both evils, and should be an urgent priority of this Court.

Certainly this concurring opinion has not given any definitive guidance concerning instances where fee-shifting is appropriate. Its purpose, however, is only to invite the litigation of this issue in cases where counsel consider it appropriate in light of the policy considerations raised in this opinion. The majority opinion just awarded attorneys' fees to the plaintiffs without much of an explanation of why. Well, that is a court's prerogative—case law, after all, is just a way of predicting what a court will do.

The fabric of the law is woven by countless thousands of *ad hoc* determinations that ultimately form a pattern that is susceptible of analysis by legal scholars. Sometimes courts are good at explaining their reasons and sometimes they are not. In any event, it is not reasons but results that count. Consequently, if the issue of attorney fees is raised, the courts will decide it, and as they decide it on a case by case basis a new pattern regarding fee-shifting may emerge that is an improvement over the universal rule that rejects fee-shifting in every case. As I have indicated above, it would appear that the most proper opportunities for such a new rule are in the area of contract disputes, property damage claims, alimony and child support collection (where attorneys' fees have traditionally been awarded) and suits where the deep pocket government is the loser. Also it would appear that consumer debt, landlord and tenant, and personal injury cases are least in need of such a rule, either because the costs of collection are already shifted or because the litigation process has developed other disincentives to litigation, such as the pain and suffering jury award, that achieve the same end.

The reason, probably, that the majority opinion did not articulate more definite reasons for shifting the attorneys' fee is that there is not a great body of law that encourages such a result. Nevertheless, the body of law is wrong and the result in this case is right, so we might just as well plough along and plant a new furrow. Once upon a time there was no law on products liability, contracts of adhesion, comparative negligence, and a host of other subjects. In the area of principled rules to govern fee-shifting, let the law begin.

---

9. In England, on the other hand, the court system was once profit-making. In 1910, for example, the English judicial system made over one million pounds from court fees. Their court system is still largely supported by court fees rather than by general revenue. R. Jackson, *The Machinery of Justice in England* 293–94 (1964).