559 S.E.2d 899

The BOARD OF REVIEW OF THE BU-
REAU OF EMPLOYMENT PRO-
GRAMS and the Commissioner of the
Bureau of Employment Programs, Ap-
pellants,

v.

Cathy S. GATSON, Clerk of the Circuit
Court of Kanawha County, Joseph A.
Panacci and Wheeling–Pittsburgh Steel
Corporation, Appellees.

No. 28457.

Supreme Court of Appeals of
West Virginia.

Submitted Feb. 7, 2001.

Decided May 1, 2001.

Mary Blaine McLaughlin, Esq., West Virginia Bureau of Employment Programs–Unemployment Compensation Division, Darrell V. McGraw, Jr., Esq., Attorney General, Donald L. Darling, Esq., Senior Deputy Attorney General, Charleston, for Bureau of Employment Programs.

Timothy F. Cogan, Esq., Cassidy, Myers, Cogan, Voegelin & Tennant, Wheeling, for Panacci.

MAYNARD, Justice.

William F. Vieweg, the Commissioner of the West Virginia Bureau of Employment Programs, and the Board of Review of the Division of Unemployment Compensation (Division) appeal an order entered on May 30, 2000 by the Circuit Court of Kanawha County, West Virginia, which reversed the decision of the Board of Review and awarded the claimant, Joseph A. Panacci, unemployment compensation benefits and attorney fees and costs. The Division contends the circuit court erred in awarding attorney fees because West Virginia's statutory law does not permit such an award to be paid from unemployment compensation funds. We believe this is so as long as the Division does not act in bad faith or with vexatious, wanton, or oppressive conduct. We find no such behavior in this case, and therefore, reverse.

## I.

## FACTS

In September 1996, Panacci, an employee of Wheeling–Pittsburgh Steel Corporation (Wheeling–Pitt), and numerous other employees were involved in a work stoppage related to a labor dispute. Panacci, along with other Wheeling–Pitt employees, opened a claim for unemployment compensation benefits on October 11, 1996, effective September 29, 1996.[1] At that time, a question existed as to whether the work stoppage was due to a strike or a lockout. The Board of Review determined the work stoppage was due to a strike. The claimants appealed this decision to circuit court where Judge Andrew MacQueen reversed the Board of Review's decision and held that the employees were "entitled to receive unemployment compensation if otherwise individually eligible." The court's order was entered on June 25, 1997.

Panacci was denied benefits because he failed to file any continued claim forms until June 1997, eight months after he initially opened his claim.[2] The decision to deny Panacci benefits was appealed to the circuit court. Judge Irene Berger found that neither the Administrative Law Judge nor the Board of Review made findings as to whether good cause existed for the late filings.[3] The

---

1. After a claimant files the initial claim form with the Division, the Division sends continued claim forms to the claimant to fill out and return biweekly. This process is governed by statute and state regulations. One of the eligibility qualifications included in W.Va.Code § 21A–6–1(1) (1994) states, "An unemployed individual shall be eligible to receive benefits only if the commissioner finds that: (1) He has registered for work at and thereafter continues to report at an employment office in accordance with the regulations of the commissioner[.]". 83 C.S.R. § 1.12 (1991) explains how to file a labor-management dispute claim. This section states:

   A. Any individual initially claiming benefits during a labor-management dispute within which he is involved shall: (1) report to the local unemployment compensation office nearest his place of residence; (2) file an application for benefits on a prescribed form furnished by the West Virginia Division of Employment Security. Individuals involved in labor disputes shall be considered as registered for work when they file an initial claim for benefits.

2. The continued claim forms are discussed in 83 C.S.R. § 13.1 (1991). This section states:

   (B) In order to establish eligibility for benefits or for waiting-period credit for weeks of total unemployment during a continuous period of total unemployment, the claimant shall file his continued claim for benefits as instructed at the local unemployment compensation claims office where he filed his initial claim for benefits to file his claims for waiting-period credit and his first compensable week; thereafter, he shall be permitted to file weekly or biweekly his continued claim for benefits by mail, on prescribed forms furnished by the Unemployment Compensation Section of the West Virginia Division of Employment Security.

3. 83 C.F.R. § 13.2 (1991) discusses claims filed before or after the regular reporting day:

   (A) The Commissioner for reasons found to constitute good cause for any individual's failure to file his continued claim on his regular reporting day may accept a continued claim for such individual if such continued claim is filed within ten (10) days from his regular reporting day for the week for which he is claiming benefits for total unemployment. Further, if the Commissioner determines the

case was remanded to the Board of Review to determine whether good cause existed. The Board of Review found that no good cause existed for filing the continued claim forms late, and Panacci was, therefore, denied benefits.

This Board of Review decision was appealed to circuit court and assigned to Judge Tod Kaufman. The circuit court found that Panacci did not learn he should have been receiving and filing bi-weekly continued claim forms until after Judge MacQueen's order was entered. The court further found that the Board testified that Panacci's original claim card was found in the Weirton office but was never sent to the office in Charleston to be processed. Consequently, Panacci did not receive the bi-weekly claim forms. The court reversed the decision of the Board of Review and awarded Panacci unemployment benefits. The court *sua sponte* awarded attorney fees and costs. It is from this order that the Division appeals.

On appeal, the Division alleges the circuit court erred by awarding attorney fees to Panacci in violation of W.Va.Code § 21A–10–5[4] and by substituting its own judgment for that of the lower tribunal.[5] Panacci argues that the circuit court has the inherent power to award attorney fees and that power is not displaced by statutes and rules. He also believes the bad faith exception comes directly from the court's inherent power.

## II.

### STANDARD OF REVIEW

■ The standard of review for unemployment compensation cases was enunciated in Syllabus Point 3 of *Adkins v. Gatson,* 192 W.Va. 561, 453 S.E.2d 395 (1994), as follows:

> reasons constitute good cause and such reasons were beyond the individual's control, the Commissioner, at his discretion, may extend the ten-day limit to ensure that a penalty, if any is imposed, is reasonable and just.

4. W.Va.Code § 21A–10–5 (1936) reads as follows:

> An individual may be represented by counsel or authorized agent before the board of review, an appeal tribunal, or examiner, or a court; but the amount of the fee for such service shall be subject to the regulation of the board.
>
> A person who charges or accepts a fee for such service in an amount unapproved by the

The findings of fact of the Board of Review of the West Virginia Department of Employment Security are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong. If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo.*

Whether the circuit court may award attorney fees against the Division presents a purely legal question. Therefore, our review is *de novo.*

## III.

### DISCUSSION

■ This Court set forth the basic rules for awarding attorney fees in *Sally–Mike Properties v. Yokum,* 179 W.Va. 48, 365 S.E.2d 246 (1986). Syllabus Point 2 of *Yokum* states, "As a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement." The *Yokum* court went on to clarify this rule with the following holding: "There is authority in equity to award to the prevailing litigant his or her reasonable attorney's fees as 'costs,' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Syllabus Point 3, *id.*

This Court previously allowed attorney fees to be awarded in cases where public officials deliberately disregarded mandatory statutory provisions. For example, in *Nelson v. West Virginia Public Employees Ins. Bd.,* 171 W.Va. 445, 449–50, 300 S.E.2d 86, 91 (1982), Public Employees Insurance Board

> board shall be guilty of a misdemeanor. Charging an unapproved amount shall constitute grounds for disbarment.

5. In its reply brief, the Division argues for the first time that the circuit court not only erred in awarding attorney fees but also erred in awarding unemployment compensation benefits. This argument is deemed waived as it was not assigned as error or discussed in the petition for appeal or the Division's brief. The other side was not afforded an opportunity to meet this issue.

members admitted they failed to implement a legislative mandate regarding optional insurance coverage to dependents of deceased members "in knowing disregard of the statute's requirements." The petitioners, a state senator and surviving spouses of deceased state workers, requested that the Board be required to extend the optional insurance coverage to those who qualified. This Court held that the statute imposed a nondiscretionary legal duty on the part of the Board to extend coverage to surviving spouses and dependents at the same average premium rate chargeable to members of the pool of which their decedents were members. Although the statute made no provision for attorney fees, the petitioners nonetheless requested attorney fees and costs. After deciding the insurance coverage issue, this Court discussed whether attorney fees should be allowed by stating:

> Citizens should not have to resort to lawsuits to force government officials to perform their legally prescribed non-discretionary duties. When, however, resort to such action is necessary to cure willful disregard of law, the government ought to bear the reasonable expense incurred by the citizen in maintaining the action. No individual citizen ought to bear the legal expense incurred in requiring the government to do its job.

*Id.*, 171 W.Va. at 451, 300 S.E.2d at 92. The Court finally determined that an award of attorney fees was justified.

Similarly, in *Richardson v. Town of Kimball*, 176 W.Va. 24, 340 S.E.2d 582 (1986), a citizen, Jackson Richardson, asked the Town of Kimball to allow him, in conformance with statutory law, to inspect selected municipal court traffic records. The Town denied the request. Richardson was thereby forced to institute legal action. In his lawsuit, Richardson requested the right to inspect and copy selected public records and an award of attorney fees. The circuit court dismissed the action. This Court reversed on appeal, finding that municipal court traffic records fall within the general statutory law which requires that court records be open to public inspection unless a statute provides otherwise. Consequently, this Court held that the Town of Kimball hindered and harassed Richardson in his attempt to exert his right to examine court records. These actions, the Court reasoned, evidenced a deliberate disregard for mandatory statutory provisions. The Court held that Richardson was entitled to costs and reasonable attorney fees "[b]ecause this action was necessitated by public officials willfully refusing to obey the law[.]" *Id.*, 176 W.Va. at 26, 340 S.E.2d at 584.

Like the statutes discussed above, our unemployment compensation law does not expressly allow recovery of attorney fees against the public body. However, unlike the cases discussed above, we find no deliberate disregard for or willful evasion of the law. If indeed Panacci filed his initial application for benefits on October 11, 1996, and we find no reason in the record to believe otherwise, the question becomes why did he not file any continued claim forms for eight months. We believe there was a breakdown in communication and both sides were somewhat at fault.

Deputy Manager Mildred Green explained the mix-up by testifying before the Administrative Law Judge as follows:

> Okay, to start off with, there was a group labor dispute claim filed on October 11th, 1996, in which the Claimant was given a packet and DA–89, or the claim form, was explained to him. He was not scheduled back in person, but was told that he could mail the claim form to us when he receive[d] it. We have noted here that he should have earnings in the week ending October 5th because apparently he had worked at the beginning of that week. Okay, then on October 16th, he was sent a notice giving him a choice between a West Virginia combined claim, at $296.00, or a straight Ohio claim, plus dependent's allowance if he had dependents at $253.00 a week. He had to make this choice by October 31st. If they don't come back and tell us they want it changed, then we keep them at the straight combined wage claim.
>
> And at that point, I never heard from him again until June, whenever he came on June 24th and insisted on filing all the weeks since the week ending October 5th so he could have appeal rights. I took all the weeks and then told him that a decision would be issued. What he brought to me was the original claim for the week . . .

a copy of it, he didn't bring me the original. He brought me a copy. It was for the week ending 10/5 and 10/12 and it had the dates changed to 10/17 and 10/24 on it. And I told him we didn't get anything from him and he said he had mailed this to us. But if he mailed it for 10/5 and 10/12, he didn't show any earnings in the first week. And he had to file 10/5 and 10/12 in order to get a claim form for 10/17 and 10/24. So since I didn't have a claim form for 10/5 and 10/12, then a claim form for 10/17 and 10/24 was not sent to him.

So I went back and took all the weeks from the week ending 10/5 showing his earnings of $110.00 in the first week, the week ending 10/5, and then a decision was made on this and that's where we are now.

Joyce Pratt, a Program Worker, testified that she took Panacci's claim as part of a group claim on October 11, 1996. She said she explained and showed copies of the forms the employees would get in the mail. She also told the employees that these forms could be mailed or dropped in a box on the front counter because the employees were not scheduled back in person. Regarding the first form they would receive, Ms. Pratt stated, "We probably had a . . . we had a form that showed them what the form would look like and how to fill it out, to sign it, date it, answer the questions, write 'labor dispute' on the back, and when to mail them into us." She told the workers the form would arrive in three to ten days and as long as they sent that form back in, they would receive another form for the next two weeks. She also explained that if any worker did not receive a claim form in the mail, then that worker should inquire with the department.

Late filings were explained in the booklet each employee received the day they initially signed up for unemployment benefits. The booklet also directed the employees to "[c]ontinue to file your claim while the decision is under appeal. If you win your appeal, you can only be paid for weeks you claim according to agency regulations." Furthermore, the booklet warned that "[f]ailure to follow these instructions may result in a delay or denial of benefits."

When Ms. Green was later asked if anything indicated whether good cause existed for the late filing in this case, she answered,

Well, the only reason he told me was because he did not receive any claim forms, whenever he came in. And the one he brought to me, like I testified earlier, he brought me a copy of, that he said he sent to us, but we never received it, the one for 10/5 and 10/12.

When the ALJ conducting the hearing asked Ms. Green if Panacci indicated where he got the claim form, she answered, "He told me he mailed it in. He had a copy of it he brought to me and he told me he mailed it to us. But when I looked at it, I said, well, the dates are changed and so we wouldn't have accepted it with changed dates." During recross-examination, claimant's counsel asked, "Your testimony is he used the word he mailed it in?" Ms. Green answered, "He told me he mailed it in." The following question was asked, "Okay, didn't he say he sent it in?" She answered, "No, he told me he mailed it in. The Claimant gave me this, telling me he had mailed this one in, when he hadn't." She continued by stating that the department did not know about the changes in the dates until June 24, "when he handed this to me because I never received a claim form from him."

Melody Lang, an interviewer and Alternate Deputy, testified that she had talked to Panacci one time in the office. He asked if a hearing was scheduled or if a ruling had been made as to whether Wheeling–Pitt employees were eligible for benefits, but he did not inquire as to why he was not receiving claim forms. When asked if other employees came to the office to say they had not received claim forms, she stated that several employees, no more than a dozen, came in to say they had not received their claim forms, especially after Ohio awarded benefits. She testified that good cause for late filing was not found in any of those cases and the claimants were awarded benefits only for the weeks they claimed up to that point.

Panacci testified that he received the booklet. When asked if he followed the instructions, he stated,

I read the booklet. I did everything they said. Upon receiving the first paper, I brought it in and Ms. Pratt told me to change the dates, to drop it into the box,

and it would be mailed and/or sent to Charleston. After doing that, I never received any more papers. Coming into the office every two weeks and/or calling, I was told that . . .

Upon further questioning regarding whether he asked about the continued claim forms, he said,

> After the first one I dropped in, Ms. Pratt helped me change the dates, we put it into the box, we sent it off. I never received any more claim forms so I came in two weeks later, as instructed by the booklet. I asked about the claim forms and they told me basically we weren't getting any more forms until it became . . . we got unemployment.

He also testified that when he came to the Division office to ask whether the Wheeling–Pitt employees were going to receive unemployment, he received the same answer each time: "[I]t was a labor dispute, we weren't getting unemployment, and we would know before they knew."

At best, the record in this case reveals that Panacci's testimony is inconsistent with that of the Division employees. He says he asked about the paperwork; they say he inquired into whether Wheeling–Pitt employees would receive unemployment benefits. Unlike the facts of *Richardson* and *Nelson*, the Bureau employees in this case do not admit to willfully refusing to obey the law nor to deliberately disregarding the law. That is the threshold in the cases in which we previously awarded attorney fees without statutory authority. Also unlike *Richardson* and *Nelson*, the petitioner in the case at bar did not request attorney fees.[6]

 Furthermore, the circuit judge gives us no clue as to why attorney fees were awarded *sua sponte*. The entire discussion in the order dealing with attorney fees states, "THEREFORE, the Court ORDERS that: . . . 2. Mr. Panacci be awarded attorney fees and costs." We cannot and will not second-guess the circuit court's rationale. We will simply apply the law as it is written. Therefore, we hold that a claimant who prevails in an unemployment compensation action may not be awarded attorney fees unless the evidence shows the Division of Unemployment Compensation acted in bad faith or with vexatious, wanton, or oppressive conduct.

In the case *sub judice*, it is not beyond the realm of possibility that Panacci received the first continued claim form but failed to send or mail it in until after Judge MacQueen ruled that Wheeling–Pitt employees were eligible to receive unemployment benefits. Judge MacQueen signed his order on June 19, 1997 and it was entered on June 25, 1997. It was during this time, on June 24, 1997, that the Division says Panacci brought a copy of his first continued claim form for the weeks of 10/5 and 10/12, with the altered dates, to the unemployment office. We are not told and the record does not reveal how or when he received this continued claim form. Therefore, we do not know how long he had it before he brought it to the office.

## IV.

## CONCLUSION

 Under the circumstances of this case, we cannot say the Division's lack of finding good cause for Panacci's late filing exhibits bad faith or vexatious, wanton, or oppressive behavior. Absent bad faith, vexatious, wanton, or oppressive conduct on the part of the Division employees, Panacci cannot be awarded attorney fees. Therefore, we reverse the circuit court and remand for an order consistent with this opinion.

Reversed and remanded.

---

6. The relief Panacci requested in circuit court reads as follows, "WHEREFORE, your Petitioner prays that upon review of this matter the Court reverse and vacate the order of the Board of Review and instead order this Petitioner admitted to benefits."